IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHRISTIAN J. WASHINGTON,
                Plaintiff,

vs.

                      Case No. 6:21-cv-01189-DDC-KGG

CITY OF WICHITA, KANSAS, a municipal
corporation, and DRAKE KREIFELS, an
individual,
                Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Timothy C. Hodge, S.C. #21397
Joseph L. Uhlman, S.C.#27949
**Adrian & Pankratz, P.A.**
tim@aplawpa.com
joe@aplawpa.com
301 N. Main, Ste. 400
Newton, KS 67114
**Attorney for Plaintiff**

David R. Cooper #16690
Charles E. Branson #17376
**Fisher, Patterson, Sayler & Smith, LLP**
dcooper@fpsslaw.com | cbranson@fpsslaw.com
**Attorneys for Defendants**

Jennifer L. Magaña, #15519
City Attorney
Sharon L. Dickgrafe, #14071
Chief Deputy City Attorney
sdickgrafe@wichita.gov
**Attorneys for City of Wichita**

## TABLE OF CONTENTS

NATURE OF THE MATTER BEFORE THE COURT ....................................................... 4

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ........................................... 6

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ................................................ 8

QUESTIONS PRESENTED ............................................................................................ 10

SUMMARY JUDGMENT
STANDARD……………………………………….............................................................11

AUTHORITIES AND ARGUMENT ............................................................................. 12

Issue I:        Kreifels is not entitled to qualified immunity on Plaintiff's § 1983 claim
                because he violated Washington's constitutional rights through his
                unreasonable use of excessive and deadly force, and because that right is
                clearly established……………………………………………………………………12

                a. Kreifels' use of excessive and deadly force when he shot Washington
                was unreasonable under the Fourth Amendment, because a reasonable jury
                could so conclude.  Thus, he is not entitled to judgment as a matter of law
                on the § 1983 claim. ............................................................................. 13
                    i.  *The Graham Factors Do Not Favor Kreifels* .............................. 13
                    ii. *Kreifels' Fear for His Safety Was Unreasonable* ........................ 15
                    iii. *Kreifels Recklessly or Deliberately Created*
                        *The Situation Leading to His Shooting of Washington.* .............. 18
                b. Kreifels' use of deadly force violated Washington's clearly-establish
                constitutional rights, as any reasonable official would have understood that
                recklessly or deliberately creating the need for deadly force violated
                Washington's rights………………………………………………………19

Issue II:       Summary Judgment is not warranted in favor of Defendants for Plaintiff's
                negligence claims, because these are not mere battery claims but separate
                and distinct claims......................................................................................... 22

Issue III:      The Defendants are not entitled to any immunities under the Kansas Tort
                Claims Act, because the Act narrowly construes immunities, and imposes
                liability for negligent or wrongful acts………………………………….....25

**Issue IV:**   **The Defendants' claimed self-defense immunities, along with other scattered defenses based around the reasonableness of Kreifels' shooting, fail because the shooting was not reasonable...**…………………………………………………….......28

CONCLUSION .............................................................................................................. 29

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CHRISTIAN J. WASHINGTON,

          Plaintiff,

VS.

CITY OF WICHITA, KANSAS, a municipal
corporation, and DRAKE KREIFELS, an
individual,

          Defendants.

Case No. 6:21-cv-01189-DDC-KGG

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Christian J. Washington, comes before the Court by and through counsel, Timothy C. Hodge and Joseph L. Uhlman of Adrian & Pankratz P.A., and submits this Response in Opposition to Defendants' Motion for Summary Judgment. In support, Plaintiff states as follows:

## I. NATURE OF THE MATTER BEFORE THE COURT

This is a civil rights action under 42. U.S.C. § 1983 arising from Officer Drake Kreifels' shooting of Christian Washington, an unarmed man. Plaintiff also asserts state-law claims against Defendants for: negligence, failure to train, failure to supervise, and battery.

Kreifels knew very little when he drove his car into a field, and immediately drew his firearm to confront Washington. Kreifels had not heard the dispatch report, and only had limited biographical and factual information available on his in-car computer. He knew that Washington was a suspect in a possible non-violent Protection from Abuse ("PFA") violation, and was provided some biographical information on Washington through his computer. As he approached the reported location of Washington, he didn't know for certain that the man he saw walking through a vacant field was the suspect involved with the reported PFA violation, but he strongly

suspected as much.  He had heard, however, that the suspect had purportedly been placing his hands near his waistband.

This was provocation enough.  Ignoring the visual cues of nearby officers who were keeping pace with Washington on foot, weapons holstered, Kreifels drove his vehicle off-road—in his own words, "on a collision course"—towards the man in the field, who began running from the vehicle as it drove straight at him.  Kreifels exited the vehicle while it was still rolling and drew his gun, chasing the man to within 30 yards.  Kreifels then began screaming commands as he pointed his gun at that man, demanding compliance.  Within 10 seconds of his first screamed command, the man complied—however, his compliance wasn't perfect.   And at the first unexpected noncompliance by the man, Kreifels shot three times, striking the man in the stomach.

A total of 23 seconds elapsed from the moment Kreifels exited the vehicle until the moment he shot the man.  That man, Christian J. Washington, was unarmed.  He carried with him only the clothes on his back and a compass in a canvas satchel.  After the dust cleared, Kreifels asserted he never saw the satchel, but was in fear for his life due to rapid movement; and then later asserted that he saw the satchel, and that it combined with rapid movement caused him mortal fear.  There is room for interpretation as to whether Washington had the satchel in his hand, but no room for interpretation about Kreifels' shifting story.

Kreifels claims he is entitled to summary judgment as a matter of law because his use of force was objectively reasonable, but he is not: a reasonable trier of fact could conclude that shooting an unarmed man within 23 seconds of contact is unreasonable, and that Kreifels recklessly or intentionally placed himself in a situation requiring the use of force, making that force unreasonable.  Beyond that, Kreifels' stories create their own internal dispute of facts, surely creating room for this case to proceed to investigate why an unarmed man was shot so quickly

while other officers exercised restraint.

## II. RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.      Paragraphs 1-3 are admitted.

4.      Paragraph 4 is admitted in part and denied in part.  It is denied to the extent that Officer Kreifels received this information from 911 Dispatch.

5.      Paragraphs 5-10 are admitted.

6.      Paragraph 11 is denied.  There is no indication from Defendants' videos that Kreifels activated his siren.

7.      Paragraphs 12-18 are admitted.

8.      Paragraph 19 is admitted and denied in part.  Admitted to the extent that Kreifels drove into the field; denied that Washington had his right hand "either tucked into his waistband or holding something in his waistband."  The video footage provided is inconclusive and difficult to discern as to this Paragraph.

9.      Paragraph 20 is admitted.

10.     Paragraph 21 is denied.  The video footage provided is inconclusive and difficult to discern as to this Paragraph.

11.     Plaintiff lacks the knowledge to admit or deny Kreifels' subjective perception as stated in Paragraph 22.

12.     Paragraphs 23-25 are admitted.

13.     Paragraphs 26 is admitted in part and denied in part.  It is admitted that Kreifels screamed those commands.  It is observed Washington did not comply during those provided timestamps.  It is denied that Washington did not comply with those commands, generally.  *See Kreifels Video,*

*0:50-52*.

14.     Paragraph 27 is admitted.

15.     Paragraph 28 is admitted in part and denied in part.  It is admitted to the extent that Washington turned to face Kreifels with his feet shoulder-width apart.  It is denied that this positioning lasted five seconds: our timestamp shows a maximum of two seconds between *Kreifels Video* 0:50-52, and this stance occurred immediately before he raised his hands.  Plaintiff is without knowledge of whether Kreifels subjectively perceived Washington's footing as a "shooter's stance," but denies it to the extent that this implies and connotes aggressive and hostile behavior.

16.     Paragraph 29 is admitted specific to that timestamp, but Plaintiff notes Kreifels first pointed his handgun at Washington earlier than this.  *See Kreifels Video* 0:31.

17.     Paragraphs 30-35 are admitted.

18.     Plaintiff is without knowledge to admit or deny what Kreifels saw, or now claims to have seen in Paragraph 36, and thus denies the same.

19.     Paragraph 37 is admitted in part and denied in part.  It is admitted to the extent these screenshots display Washington's arm raised; it is denied to the extent that a dark object can be seen in Washington's right hand.

20.     Paragraph 38 is denied.  The characterization "suddenly punched out" is denied; that there was an object in his right hand is denied.

21.     Paragraph 39 is admitted.

22.     Paragraph 40 is admitted in part and denied in part

23.     Plaintiffs are without knowledge to admit or deny what Kreifels feared, or now claims to fear in Paragraph 41.

24.     Paragraph 42 is admitted in part and denied in part.  It is admitted that Kreifels fired his handgun three times; it is denied to the extent that Plaintiff is without knowledge to know what Kreifels feared, or now claims to fear.

25.     Plaintiffs are without knowledge to admit or deny what Kreifels believed, or now claims to believe in Paragraph 43.

26.     Paragraph 33 is admitted.

27.     Paragraph 45 is admitted in part and denied in part.  It is denied to the extent that Washington was "still" holding the object in his right hand; it is admitted that Kreifels made those statements to Washington.

28.     Paragraph 46 is admitted.

29.     Paragraph 47 is admitted in part and denied in part.  It is admitted to the extent that Officers Oliverson and Hoyt rolled Washington on his stomach for handcuffing; the Plaintiffs are without knowledge as to what Kreifels saw and thus deny the same, and further deny its positioning in Washington's right hand.

30.     Paragraphs 48-51 are admitted.

31.     Any statement not specifically admitted is denied.


### III. PLAINTIFF'S SET OF ADDITIONAL FACTS

1.     Officers Oliverson and Whisby first approach Washington as he walks opposite a row of residential houses.  *Oliverson* 0:30-0:45.

2.     These officers approach Washington and begin issuing commands.  Washington begins jogging away, and they follow, maintaining distance.  In fact, at one point Officer Oliverson instructs Officer Whisby to "hang back, just a bit" when Whisby begins to close the distance

between himself and Washington. *Oliverson* 0:30-1:00; 2:10-2:12.

3.      Washington appears to turn towards the officers and shout the same expletive to them as he did to Kreifels, yet they do not respond with force—even after Officer Oliverson reports that Washington has his hands at his waistband. *Oliverson* 2:05-2:10.

4.      In the minutes prior to Kriefels shooting Washington, Officers Oliverson and Whisby are walking behind Washington at a much greater distance than the distance between Kreifels and Washington at the time of the shooting. *Oliverson* 2:30-4:13.

5.      Immediately after shooting Washington, Kreifels takes 13 steps towards Washington.  He then freezes, and begins screaming commands for Washington to "let go" and "let go of whatever is in your right hand."  This is the first mention of any items in Washington's hands by Kreifels, and first commands aimed at removing handheld items. *Kreifels* 0:56-1:15.

6.      On the morning following Kreifels' shooting at approximately 3:30, he was interviewed by investigators with the Kansas Bureau of Investigation.

7.      Kreifels states in that interview that he did not hear the initial 911 dispatch report.  Instead he had the information sent to him by text through his Mobile Data Terminal.  The only information reported on that was the name of the suspect, that there was a possible PFA violation, that the suspect may have jumped into a lake, and the last known location and direction of travel of the suspect. *Kreifels Interview* 12:32-13:42.

8.      Kreifels states that as he first saw the suspect and Officers Oliverson and Whisby, all three were walking across the vacant field.   There was nobody else around. *Kreifels Interview* 19:02-19:30.

9.      Kreifels states when maneuvered his car into the field, he maneuvered it "directly in line" with Washington. *Kreifels Interview* 19:55-20:05.

10.     As Washington begins to "jog" away, Kreifels maneuvers his car into a "collision course" with Washington. *Kreifels Interview* 19:36-21:23.

11.     Kreifels states that after Washington assumed a "shooter's stance," he stated, "I want to die" or "I don't want to live." *Kreifels Interview* 23:53-24:13.

38.     Kreifels states that following these statements, Washington takes his right hand immediately from his waistband and "punches it out" at him. ***This is the first time Kreifels mentions the dark object. He does not mention seeing this object when Washington's hands were raised at shoulder-height***, in contradiction with his Motion for Summary Judgment, and his Affidavit. *Kreifels Interview* 24:25-25:01.

12.     When asked minutes later to explain, again, what occurred in the moments prior to him shooting Washington, Kreifels stated Washington's right hand had been concealed "this whole time" and that Washington performed a "quick draw" from his waistband while "punching out." *Kreifels Interview* 45:12-45:36.

13.     When asked what, exactly, Washington said to him, Kreifels reiterated that Washington said either "I want to die" or "I don't want to live anymore" as he turned to face Kreifels. *Kreifels Interview* 46:55-47:11.

14.     And again, as Kreifels is discussing the routes he and Washington were on relative to each other while Kreifels was driving, he reiterates "we were on a collision course." *Kreifels Interview* 49:55-50:05.

## IV. QUESTIONS PRESENTED

1.     Summary judgment at this stage in the proceedings is not appropriate because there has been no formal discovery.

2.     Kreifels is not entitled to qualified immunity on Plaintiff's § 1983 claim because he

violated Washington's constitutional rights through his unreasonable use of excessive and deadly force, and because that right is clearly established.

    a.    Kreifels' use of excessive and deadly force when he shot Washington was unreasonable under the Fourth Amendment, because a reasonable jury could so conclude. Thus, he is not entitled to judgment as a matter of law on the § 1983 claim.

    b.    Kreifels' use of deadly force violated Washington's clearly-establish constitutional rights, as any reasonable official would have understood that shooting an individual under similar circumstances would violate that individual's rights.

    c.    Kreifels is not entitled to qualified immunity because he was either plainly incompetent or was knowingly violating the law when he rushed—with his firearm brandished—an unknown person in a vacant field with no report of that person being armed or a threat to others, closed the distance between himself and that person and shot him within 23 seconds.

3.    Summary Judgment is not warranted in favor of Defendants for Plaintiff's negligence claims, because these are not mere battery claims but separate and distinct claims.

4.    The Defendants are not entitled to any immunities under the Kansas Tort Claims Act, because the Act narrowly construes immunities, and imposes liability for negligent or wrongful acts.

5.    The Defendants' claimed self-defense immunities, along with other scattered defenses based around the reasonableness of Kreifels' shooting, fail because the shooting was not reasonable.

## V. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that "no genuine

dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must

view the evidence and draw inferences in the light most favorable to the non-moving party. *Scott*

*v. Harris*, 550 U.S. 372, 378 (2007). An issue of material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "material" if it has the ability to "affect the

outcome of the suit." *Id.*

## VI. AUTHORITIES AND ARGUMENT

1.      *Kreifels is not entitled to qualified immunity on Plaintiff's § 1983 claim because he violated Washington's constitutional rights through his unreasonable use of excessive and deadly force, and because that right is clearly established.*

The doctrine of qualified immunity protects government officials from liability for civil

damages "insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231

(2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). "Qualified immunity balances

two important interests—the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Id.*  To establish a § 1983 claim against an individual defendant

who asserts the defense of qualified immunity, a plaintiff must: a) come forward with facts that

make for a violation of a constitutional right, and b) demonstrate that right was "clearly

established" at the time of the defendant's misconduct. *Id.* at 232.

To hold a defendant liable under § 1983, it is not necessary that "the very action in question

has previously been held unlawful." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866-67 (2017) Thus, for

qualified immunity to apply, courts do not require a "reported case directly on point." *Id*. at 1867. Rather, courts must evaluate whether the unlawfulness of the officer's conduct is apparent "'in the light of pre-existing law." *Id*.   To summarize, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id*.

Kreifels was either plainly incompetent or he knowingly violated the law. He drove his vehicle off-road into a vacant field, on a collision course with an unarmed man who was walking. He then rushed the man with his gun drawn, screamed commands for mere seconds, then shot the man—all after observing nearby officers following the man on foot, weapons holstered.   Because of this, and because Kreifels' use of deadly force was the result of his own unjustified escalation of the situation, thus making the force excessive, summary judgment on his behalf is not warranted.

a.    *Kreifels' use of excessive and deadly force when he shot Washington was unreasonable under the Fourth Amendment, because a reasonable jury could so conclude.  Thus, he is not entitled to judgment as a matter of law on the § 1983 claim.*

Any claim that law enforcement officers have used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard and subsequent analytical framework. *County of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). Under that analytical framework, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396 (1989) (the "*Graham* Factors").

i.    The *Graham* Factors Do Not Favor Kreifels

As to the first factor, the severity of the crimes in question are minimal: misdemeanors only.  Washington purported violated a PFA in a non-violent way, a class-A misdemeanor.  KAN.

STAT. ANN. § 21-5924.   Fleeing from law enforcement is also a class-A misdemeanor, when the offense predicating the flight is a misdemeanor.   KAN. STAT. ANN. § 21-5924(a)(3), (b)(5)(B). Kreifels states in his Motion that Washington committed the offense of aggravated assault, but this is a factual impossibility: the aggravating factor in assault in Kansas is the use of a deadly weapon. KAN. STAT. ANN. § 21-5412(b)(1).   Again, Washington was unarmed—so again, the worst criminal exposure for this alleged offense is a class-A misdemeanor.  KAN. STAT. ANN. § 21-5412(e)(3).

As to the second factor, Washington wasn't posing an immediate threat to the safety of officers or others.  He was unarmed.  He wasn't posing a risk to others, as he was in a vacant field with no others around.  And he wasn't an immediate threat to officers: prior to his contact with Kreifels, he had made contact with two other officers, and that contact ended without violence or the threat of violence.

As to the third factor, Washington does avoid contact with law enforcement, so it would seem reasonable for officers to believe he was fleeing the scene.  As Kreifels states, he was "jogging" away.  But it's critical to note that a) other officers were approaching him at a walking pace with their weapons holstered, cutting against Kreifels' decision to rush Washington with his weapon drawn, and b) Washington had jogged away from the road, and into a large, unpopulated area: a corn-stubble field.  There was no reasonable reason for Kreifels to run Washington down in an automobile while Washington was walking, and no reason to sprint at him while he was jogging in that field.  Kreifels had no justifiable reason to bring the situation to the point of violence where none had existed.

So only one of the *Graham* Factors applies to Washington, and only just barely.  He was arguably fleeing from law enforcement, but that fleeing via jogging was being managed by other

law enforcement, and those officers were likely ones who had heard 911 Dispatch's report of prior law enforcement contact. Yet, those officers were addressing the situation calmly, and without the use of force.  Only Kreifels made the decision to drive a patrol car off-road on a collision course with Washington.  Only Kreifels made the decision to immediate draw his firearm and sprint after Washington.  And only Kreifels made the decision to shoot him.

ii.   <u>Kreifels' Fear for His Safety Was Unreasonable</u>

Kreifels claims that, despite Washington being unarmed and having committed no acts of violence, his shooting of Washington was justified because he was in reasonable fear for his safety. But the oft-used legal citation to justify an officer's shooting apply *against* Kreifel here.

The "reasonableness" of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Tennessee v. Garner*, 471 U.S. 1 (1985).  Kreifels now invokes the benefit of 20/20 hindsight vision to justify his shooting, but there are serious concerns with his recitation of events viewed in light of the AXON bodycam video:

- He claims in his Affidavit that "dispatch had advised that the calling party reported" a number of things, particularly that Washington had previously been violent with the police. However, he states in his interview immediately following the shooting that he had not heard the initial dispatch information.

- He claims he observed Washington's "right hand on his waistband" while jogging. However, Kreifels was a) a considerable distance away, b) Washington was running in profile to Kreifels, with his right side obstructed, and c) the time from Kreifels exiting his vehicle to when Washington stopped running accounts for only 12 seconds.  Kreifels may have been able to observe Washington slightly longer while in his vehicle, this would have

15

been from an even greater distance away and while Kreifels was driving off-road, lessening the reliability of his information.

- Kreifels knew other officers were approaching Washington, and could or should have seen them approaching Washington at a walk and at distance—and he charged forward. He had purportedly heard reports from other officers on scene that Washington's hands were at his waistband.

-  Kreifels does not appear to recognize Washington has anything in his hands until *after* he shot him. Following the shooting, and while Washington is lying supine, he takes 13 steps towards Washington—closing the distance by more than half— before immediately halting. He then begins to yell at Washington to "let go of whatever is in your right hand." There had been no similar commands prior to the shooting, nor any indication Washington had anything in his hands: only a repeated "get your hands up."

- It makes little sense that Kreifels would fear whatever Washington had in his hands, and respond to that fear by sprinting towards him. Again, Washington was in a vacant field, with no civilians anywhere in the vicinity.

- And all of the above culminates with Kreifels giving contradictory statements regarding the events. The day following the event, under investigation from the KBI, Kreifels states he observed no items or potential weapons on Washington until the moment Washington "punches out" his right hand from his waistband. Now, to support his summary judgment motion, Krefiels asserts he saw a potential weapon in Washington's hand as his arms were extended.

For illustration, compare Kreifels' reckless and rash response to that of Officers Oliverson and

Whisby, who had contacted Washington minutes before:

- These officers approach Washington as he walks opposite a row of residential houses.

- They walk towards him, and issue commands to Washington. Washington begins jogging away, and they follow, maintaining distance. In fact, at one point Officer Oliverson instructs Officer Whisby to "hang back, just a bit" when Whisby begins to close the distance between himself and Washington.

- Washington appears to turn towards the officers and shout the same expletive to them as he did to Kreifels, yet they do not respond with force—even after Officer Oliverson reports that Washington has his hands at his waistband.


This contrast shows contradiction on Kreifels' recitation of events as found in his Affidavit. And even if this contrast does not show the discrepancies in the logical procession of Kreifels' behavior, one needs not labor to find contradictory versions of events: Krefiels provides that himself. There are currently at least three versions of events presented: Washington's, Kreifels', and Krefiels'.

All of these issues cast enough suspicion to believe that a jury could find more credibility in Washington's story: that Kreifels acted unreasonably under the totality of the circumstances. Thus, an issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (An issue of material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *see also Reavis ex rel. Coale v. Frost,* 967 F.3d 978, 986-92 (10th Cir. 2020) (holding that the presence of even one *Graham* Factor in favor of the plaintiff was sufficient to deny qualified immunity). And because there is a genuine dispute exists regarding a material fact, Defendants are not entitled to summary judgment as a matter of law.

Beyond the conclusion that the above creates a genuine dispute of material fact, it also raises another critical issue: Kreifels recklessly or deliberately during the seizure created the need for such force.

> iii.   Kreifels Recklessly or Deliberately Created This Situation Leading to His Shooting of Washington.

An excessive-force inquiry is not constrained to the precise moment lethal force was used. *Estate of Valverde v. Dodge,* 967 F.3d 1049, 1066-67 (10th Cir. 2020). If an officer's own reckless or deliberate conduct during the seizure created the need for such force, then use of that force is unreasonable. *Id.* Under this analysis, the totality of the facts and circumstances are considered in determining whether the level of force was reasonable, including any immediately connected actions by the officers that escalated a non-lethal situation to a lethal one. *Romero v. Board of County Comm'rs,* 60 F.3d 702, 705 (10th Cir. 1995).

As shown above, Kreifels' recklessness can be shown in direct contact to other officers responding to the scene, who had immediate prior contact with Washington. Officers Oliverson and Whisby also confronted Washington, and had received similar responses as Kreifels: Washington appeared to disregard their commands and jogged away. Officer Oliverson noted Washington's hands near his waistband, and instead of charging Washington—who at that time was near a residential area—he instead kept a safe distance. Both officers continued communication with Washington while keeping that distance, following him as he jogged away from the residential area and into the vacant field.

But not Kreifels. Instead of following suit, he drove his car "on a collision course" towards Washington, exiting his vehicle with gun drawn. He sprinted at Washington until he was within 30 yards, screaming commands. He placed himself in the close situation with Washington where, a mere 23 seconds after contact, movement that didn't comport with Kreifels' screamed commands

led to Kreifels immediately shooting Washington.  Officers Oliverson and Whisby had been following Washington for over four minutes—four minutes where Washington did not appear to be complying with their commands—yet neither of them discharged their firearms.

Kreifels had, in only seconds, sprinted into an unknown situation at close range to Washington, *even knowing* Officer Oliverson had announced on the radio that Washington had his hands near his waistband.  Kreifels recklessly, or deliberately, rapidly escalated the situation and placed himself in a situation where there was not enough time to determine what, if anything, Washington was carrying.  One could imagine countless other outcomes to this scenario, but such imagination isn't necessary: instead, one need only look at the response of other officers on scene to see how this situation could have been resolved without the use of deadly force.

So, contrary to Kreifels' position, the analysis of whether his use of force was reasonable doesn't start and end at the split-second moment of shooting.  Instead, viewing the totality of the circumstances surrounding the shooting, it becomes plain that his reckless or deliberate response caused him to be in the situation where such a split-second response was even required.

b.   *Kreifels' use of deadly force violated Washington's clearly-establish constitutional rights, as any reasonable official would have understood that recklessly or deliberately creating the need for deadly force violated Washington's rights.*

A clearly established right is one that is sufficiently clear, and one that every reasonable official would have understood that action taken adversely to that right would violate it. *Mullenix v. Luna*, 577 U.S. 7, 10 (2015) Courts are instructed not to define the right at issue "at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

However, this standard doesn't require a case "directly on point" for a right to be plainly and clearly established. *Id*. at 551. Instead, to find that a statutory or constitutional right is clearly established, "existing precedent must have placed the statutory or constitutional question beyond

debate." *Id*. The precedent clearly establishing a constitutional right must come from "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Reavis*, 967 F.3d at 992.

As noted above, if an officer's own reckless or deliberate conduct during the seizure unreasonably created the need for deadly force, then such force is unreasonable. *Estate of Valverde,* 967 F.3d at 1066-67. There are a number of on-point precedents that support this, and delineate clearly-established law on this matter that place it beyond debate:

- *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997). In this oft-cited case, Allen left his home following a domestic altercation with guns and ammunition. *Id.* at 839. He was found by officers parked in his vehicle, threatening suicide but not threatening any others. *Id.* After refusing to follow commands by law enforcement, officers rushed his vehicle. *Id.* In the ensuing struggle, Allen pointed his gun at an officer, and the officers responded by shooting and killing him. *Id.* The court held that the officers recklessly escalated the situation and created the need for force, and thus the resulting use of force was excessive. *Id.* at 841.

- *Tenorio v. Pitzer,* 802 F.3d 1160 (10th Cir. 2015). 911 Dispatch relayed a call to law enforcement that a man was intoxicated and holding a knife to his own throat. *Id.* at 1162. Officers arrived and approached the man, Tenorio, with weapons drawn. *Id.* After attempts at verbal commands to Tenorio failed, Tenorio took three steps towards officers. *Id.* at 1163. Officers responded by shooting Tenorio, mortally wounding him. *Id.* The court held that the officers lacked the probable cause to believe he was a danger to himself and others. *Id.* at 1166.

- *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003). Police were dispatched to a report of an assault at an apartment building. *Id.* at 1224. Police arrived and confronted Castle, who

was acting "very excited and aggressive." *Id.* at 1225.  Police attempted to arrest Castle, but he fled, assaulting the officers in the process.  *Id*. Officers eventually cornered him near a fence, where Castle threw concrete at them. *Id.* Officers responded by shooting and killing him.  *Id*.  The court held that it was objectively unreasonable to shoot him, as he was unarmed and posed no threat.  *Id.* at 1227.

In all the above, the officers were dealing with an individual who was armed, or carried an identifiable weapon.  Additionally, it is well-established that a law enforcement officer may not use deadly force to seize an unarmed person.  *Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008) ("it is clearly established law that deadly force cannot be used when it is unnecessary to restrain a suspect or secure the safety of officers, the public, or the suspect himself"); *Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666-67 (10th Cir. 2010) (use of Taser could constitute excessive force where reasonable jury could conclude that  the plaintiff did not pose an immediate threat to the officer or anyone at the scene).

Any reasonable officer knows or should know that established law exists preventing the use of excessive force against an unarmed person.  Any reasonable officer knows or should know that reckless or intentional escalation of conflict with an *armed* resulting in the use of deadly force is excessive.  The simple arithmetic between these two established laws is that a reasonable officer know or should know that the reckless or intentional escalation of conflict with a *possibly unarmed* individual resulting in the use of deadly force is absolutely prohibited.

To hold otherwise would allow officers, acting under color of law, to provoke "punching-out" motions from citizens, allowing law enforcement to justifiably shoot them for anything they

may have on their person, whether it resembles a firearm or not. Under such a standard, even a mere compass would pass as a mortal threat. Surely that is not the protection that qualified immunity affords.

2.      *Summary Judgment is not warranted in favor of Defendants for Plaintiff's negligence claims, because these are not mere battery claims but separate and distinct claims.*

Plaintiff's claims are not just battery claims in disguise as asserted by Defendants, but rather separate and distinct claims. The Defendants cite to *Baska v. Scherzer* as their primary authority, *Baska v. Scherzer*, 283 Kan. 750 (2007). The reliance on this authority appears oft-cited by Defendants, but rarely applied by the Court.

The Kansas Supreme Court has long recognized claims for negligence arising out of an officer's unreasonable use of force. *Dauffenbach v. Wichita*, 233 Kan. 1028, 1036 (1983); *Gardner v. McDowell*, 202 Kan. 705 (1969); *Bukaty v. Berglund,* 179 Kan. 259 (1956). Moreover, the Kansas federal courts, including the Tenth Circuit Court of Appeals, also acknowledge Kansas law's recognition of claims for negligent use of force. *See Taylor v. Phelan,* 9 F.3d 882, 886 (10th Cir. 1993) (acknowledging the holding in *Dauffenbach* and affirming that an officer is liable for injuries he caused when there is a special duty owed by an officer to an individual.); *See also Carl v. City of Overland Park, Kan.,* 65 F.3d 866, 870 (10th Cir.1995). Critically, the Kansas District Court found in *Clark v. Thomas* that the Kansas Supreme Court set forth the standard for an excessive-force negligence claims in *Dauffenbach*. *Clark v. Thomas*, 505 F. Supp. 2d 884, 890 (D. Kan. 2007)

In *Dauffenbach v. City of Wichita*, the Kansas Supreme Court specifically recognized the special duty officers owe to individuals and affirmed the decision of the lower courts regarding their finding that the plaintiff successfully stated a claim for negligence based on the officer's use

of force. *Dauffenbach* at 1030.   Regarding whether Dauffenbach's Petition could be amended to add a negligence claim—including whether such claim was valid—the Court stated:

> "As we view Dauffenbach's original petition, it states a cause of action for negligence under K.S.A. 60–208(*a*). He contends the defendants did "negligently assault, beat and injure" him and that any "negligence" on the part of the officers "is likewise the negligence" of the city. The trial court did not err in allowing the amended petition to be filed." *Id.* at 1032 (emphasis added).

With this language, the Kansas Supreme Court expressly recognized the right to file a claim for negligent use of force. If Kansas did not allow negligence claims based on unreasonable force by police officers, the Court would have reversed the decision of the lower courts and ordered the claim for negligence dismissed as a matter of law.

The Court went on to discuss the presence of a special duty that officers owe to citizens not to harm them during an arrest and that liability may attach where an affirmative act by the officer causes an injury. *Id.* at 1033. The court cited as authority its line of cases in *Bradford v. Mahan,* 219 Kan. 450 (1976) (reversing lower courts' dismissal of claims after finding personal liability exists against police officers who injure a person even when engaged in a governmental function.); *Gardner v. McDowell,* 202 Kan. 705 (1969) (reversing lower court's order dismissing police officers pursuant to KAN. STAT. ANN. § 60-212(b)(6) after finding the petition stated a cause of action where it alleged officers used unnecessary force by "negligently" shooting a woman at point blank range); and *Bukaty v. Berglund,* 179 Kan. 259 (1956) (citing with approval 80  C.J.S., *Sheriffs and Constables*, § 117, that posits a law enforcement officer is liable for  negligent or wrongful acts causing injury or death). All of these cases included  claims against officers for their negligent acts that caused injuries and death. The Kansas  Supreme Court reversed the lower courts' dismissal of the claims in each, holding they are a  question of fact for a jury to decide.

Additionally, the Court made the following analysis:

"[T]he public should be protected from overreaction by law enforcement officers. It is not the duty of a law enforcement officer to punish a suspect by using unreasonable force or to wantonly or maliciously injure the suspect. A public citizen should be compensated when unreasonable force by a law enforcement officer causes an injury whether the injured party is a pillar of the community, an incoherent drunk or mentally ill. We see no reason to make a distinction between a traffic accident which involves a vehicle driven by a law enforcement officer (or the felling of a tree) and the unreasonable use of force in making an arrest." *Id.* at 1035-36.

The language used by the Court implies a use of force continuum containing negligence (unreasonable force), deliberate indifference (wanton use of force) and battery (malicious use of force.) Depending on the circumstance of the case, an officer's use of force may be privileged, negligent, a deliberately indifferent civil rights violation, or an intentional battery.

In *Nemecheck v. City of Garden City*, the Kansas Court of Appeals stated that "contrary to the suggestions of the defendants' counsel, a plaintiff may choose to allege excessive force claims under state tort law. However, in Kansas, no tort of "excessive force" exists; a plaintiff must instead bring tort claims that are recognized under Kansas law, like battery, outrage, and negligence." *Nemecheck v. City of Garden City*, 233 P.3d 314 (Kan. Ct. App. 2010). It seems undeniable that negligence is a valid action in a case involving the improper use of force by law enforcement.

Law enforcement officers owe a special duty of care in the performance of their duties through affirmative acts. Defendants argue that any negligence claim of Plaintiffs must fail because for lack of a duty of care. However, as set forth above, the Kansas Supreme Court held that, although police officers generally are immune from liability on claims arising from performance of their general duties, liability does arise upon the breach of a special duty owed by an officer, such as where an affirmative act of the officer causes injury**.** *Dauffenbach*, 233 Kan. at 1033. The KTCA itself states "the finder of fact may consider the failure to comply with any

written personnel policy in determining the question of negligence." KAN. STAT. ANN. §75-6104(d).

*Baska*—which again, the Defendants heavily rely upon—is easily distinguishable from the current case and is neither instructive nor controlling. The defendants in *Baska* were not police officers and did not possess any privilege to use force. Whereas in this case, the Defendant was operating in the course of his duties  and with the privilege to use reasonable force to effectuate his duties.

Here, Kreifels recklessly or deliberately operated in violation of the law when he escalated the interaction with Washington, resulting in Kreifels shooting Washington. Since the question of battery versus negligence is one of subjective intent, it is entirely reasonable and possible that a trier of fact could find Kreifels negligent instead of reckless. Because Kansas law allows for a negligence action against a public safety official due to their special duty to citizens, and because a trier of fact could find Kreifels liable for negligence but not recklessness, there is no basis for summary judgement in favor of Defendants on the Plaintiff's negligence claim.

3. *The Defendants are not entitled to any immunities under the Kansas Tort Claims Act, because the Act narrowly construes immunities, and imposes liability for negligent or wrongful acts.*

 Defendants ask this Court to improperly broaden the scope of the KTCA exceptions under KAN. STAT. ANN. §75-6104(c), citing to several provisions and attempting to claim shelter under each. These all fail because under the KTCA, liability is the rule, and immunity is the exception. *Moran v. State,* 267 Kan. 583, 593 (1999).  The KTCA states that "each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope  of their employment under circumstances where the

governmental entity, if a private person, would  be liable under the laws of this state." KAN. STAT. ANN. § 75-6103. Exceptions granting immunity are to be narrowly construed. *Estate of Belden v. Brown Cnty.*, 46 Kan. App. 2d 247, 290, (2011), *citing Jackson v. City of Kansas City,* 235 Kan. 278, 286 (1984).

The exceptions contained in the KTCA were not intended to permit police officers to violate the prohibition in *Dauffenbach* against unreasonable force. *Dauffenbach v. City of Wichita,* 233 Kan. 1028, 1033 (1983).  None of the exceptions of KAN. STAT. ANN. § 75-6104 are intended to permit police officers to violate the prohibition against the use of unreasonable force. *Caplinger v. Carter*, 9 Kan. App. 2d 287 (Kan. Ct. App. 1984).

The Kansas Supreme Court has addressed the application of the discretionary function and police protection exceptions. The police protection exception is addressed to such matters as the number of police officers assigned to an area, or the number and type of vehicles used by the department. It does not provide immunity  for every  aspect of negligent police department operations. See  *Gragg v. Wichita State Univ.,* 261 Kan. 1037, 1060 (1997) ( "A City is immunized from such claims as burglary could have been prevented if additional cars had been on patrol. . . we do not believe subsection (n) is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe  the city has  immunity therefor on the basis  the  negligent  act  was  a  part  of  the  method  of  fire  protection.") Referring to the discretionary function exception, the Kansas Supreme Court held  that the governmental entity or employee does not have discretion to violate a legal duty and  thereby avoid liability. *Moran v. State,* 267 Kan. 583, 597 (1999).

Discretion requires more than the mere exercise of some judgment, because judgment  is

exercised in nearly all endeavors; instead, a *discretionary* function "must involve some element of policy formation." *Clark v. Thomas*, 505 F. Supp. 2d 884, 895 (D. Kan. 2007). "Contrary to defendant's position, the discretionary function does not shield a law enforcement officer who uses an unreasonable amount of force or acts maliciously or wantonly during an arrest." *Id.*; *see also Campbell v. City of Leavenworth,* 28 Kan.App.2d 120, 127 (Kan. Ct. App. 2000) ("Discretionary immunity would not apply to an excessive force claim which is based on a negligence theory.")

Further, Defendants appear to be attacking Plaintiff's failure to train and failure to supervise under the KTCA exceptions. A failure to train claim against a municipality has five elements: a) the training was in fact inadequate; b) the officers exceeded constitutional limitations on the use of force; c) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; d) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and e) there is a direct causal link between the constitutional deprivation and the inadequate training. *Cacioppo v. Town of Vail, Colo*., 528 Fed. Appx. 929, 933 (10th Cir. 2013), *citing Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). The Tenth Circuit treats allegations of failure to supervise in the same manner as failure to train claims. *Bell v. City of Topeka*, 496 F. Supp. 2d 1182, 1194 (D. Kan. 2007).

But the Defendants do not seek summary judgment on those elements. Instead, they appear to only seek it through the premise that if Kreifels' shooting was justified—that is, if Kreifels did not violate Washington's constitutional rights—then, as a matter of law, the City of Wichita cannot be liable for either failure to train, or failure to supervise. To the extent this is a fair and complete reading of the Defendants' summary judgment arguments on the matters of failure to train and

failure to supervise, we simply reassert that Kreifels' shooting was not reasonable for the reasons set forth above.  Because again, under the KTCA liability is the exception, not the rule. And none of those exceptions cover an officer who wrongfully shoots another, nor a governmental agency while that officer is operating under color of law.

4.  *The Defendants' claimed self-defense immunities, along with other scattered defenses based around the reasonableness of Kreifels' shooting, fail because the shooting was not reasonable.*

The Defendants cite to Kansas's immunity from criminal prosecution and civil liability as a justification for summary judgment.  But Kansas only provides self-defense immunity if the use of force is reasonable.  KAN. STAT. ANNS. § 21-5222, 5223, 5225, 5226, 5231.  So the same findings that result from a qualified immunity analysis applies here as well: because Kreifels applied unlawful excessive force against Washington, his purported self-defense is not reasonable.  As the Defendants point out, a reasonableness-of-force assessment applying federal law results in the same conclusions under state law.  *Arnold v. Olathe Kansas,* No. 2:18-CV-02703-HLT, 2021 WL 3129408, at *16 (D. Kan. July 23, 2021).

The remainder of the Defendants' arguments not specifically mentioned herein appear to have this same analytical framework: if Kreifels use of force was reasonable, he is not liable and summary judgment is appropriate.  To all of these substantively similar arguments artfully pled as separate and unique issues requiring unique analysis that are not specifically mentioned in our Response, we brief by simply restating our position that Kriefels did indeed act unreasonably. Because he acted unreasonably, and in contravention of law any reasonable officer would have known, summary judgment in the Defendants' favor not appropriate.

VII.     CONCLUSION

For the reasons set forth above, Christian J. Washington respectfully requests the Court deny the Defendants' Motion for Summary Judgment, and any other relief the Court finds just and appropriate.

RESPECTFULLY SUBMITTED,

/s/ Timothy C. Hodge
Timothy C. Hodge, SC #21397
Joseph L. Uhlman, SC #27949
ADRIAN & PANKRATZ, P.A.
tim@aplawpa.com
joe@aplawpa.com
Attorneys for Plaintiff

**Certificate of Service**

I hereby certify that on October 29, 2021, I caused the foregoing to be electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to the following:

David R. Cooper #16690
Charles E. Branson #17376
dcooper@fpsslaw.com | cbranson@fpsslaw.com
**Attorneys for Defendants**

Jennifer L. Magaña, #15519
City Attorney
Sharon L. Dickgrafe, #14071
Chief Deputy City Attorney
sdickgrafe@wichita.gov
**Attorneys for City of Wichita**

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: No one.

/s/ Timothy C. Hodge
Timothy C. Hodge, SC #21397
ADRIAN & PANKRATZ, P.A.
tim@aplawpa.com
Attorneys for Plaintiff