# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**CHRISTIAN J. WASHINGTON,**

        **Plaintiff,**

v.

                                               **Case No. 21-1189-DDC-KGG**

**CITY OF WICHITA and
DRAKE KREIFELS,**

        **Defendants.**

---

## MEMORANDUM AND ORDER

This case is difficult. It involves a police shooting of an unarmed civilian who a police officer mistakenly believed was armed and threatening his life. The ultimate question in this case comes down to whether that mistake was reasonable. For reasons explained below, the court concludes a jury could find that it wasn't reasonable. So, the court denies much of defendants' motion for summary judgment.

The entire encounter between the shooting victim (plaintiff Christian J. Washington) and the Wichita Police Officer (defendant Drake Kreifels) lasted about 26 seconds. During this half minute, Officer Kreifels—responding to reported non-violent misdemeanors—drove his patrol car onto an empty field on what he called a "collision course" with plaintiff, who was running from other police officers. Officer Kreifels exited his car and drew his gun immediately. He chased after plaintiff yelling for him to get his hands up. After Officer Kreifels chased him for a few more seconds, plaintiff stopped running and turned around. He raised his arms to his side, shouted a profanity at Officer Kreifels, and then moved his arms in front of him. During this encounter, Officer Kreifels believed plaintiff had a dark object in his hand. He believed it was a

gun and that plaintiff was going to shoot him.  So, Officer Kreifels shot plaintiff.  Plaintiff was unarmed.  He since has recovered from his injuries.

Plaintiff now brings this lawsuit, asserting claims under 42 U.S.C. § 1983 and Kansas state law against Officer Kreifels and the City of Wichita.  Defendants move for summary judgment against those claims.  *See* Doc. 19.  Of note, Officer Kreifels asserts qualified immunity against plaintiff's § 1983 claim for excessive force.  But the court finds he isn't entitled to qualified immunity at the summary judgment stage.  For reasons explained in detail below, the court mostly denies defendants' Motion for Summary Judgment.  But it grants the motion in part.  Specifically, it grants summary judgment against plaintiff's state law negligence claim.  And it denies summary judgment against plaintiff's § 1983 claims and his battery claim.[1] The court explains these conclusions, below.

## I.     Background

The court draws the following summary judgment facts from the four pieces of evidence contained in the summary judgment record:  (1) defendant Officer Drake Kreifels's AXON bodycam video (filed conventionally); (2) Officer Mark Oliverson's AXON bodycam video (filed conventionally); (3) Officer Kreifels's videotaped interview with a Wichita Police Department detective and a Kansas Bureau of Investigation (KBI) investigator, which occurred hours after the shooting (also filed conventionally); and (4) Officer Kreifels's Affidavit describing his perspective alongside still-frame images captured by AXON bodycam video (Doc.

---

[1]     The court exercises supplemental jurisdiction over plaintiff's state law claim under 28 U.S.C. § 1367.  The court has original subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiff asserts § 1983 claims, which "aris[e] under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  And, the court concludes, plaintiff's Kansas state law claims "are so related" to the § 1983 claims "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

19-1).[2]  The following facts are uncontroverted, or, where genuinely controverted, viewed in the light most favorable to plaintiff, who opposes summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

On July 14, 2019, around 8:05 p.m., 911 dispatch in Wichita, Kansas, reported a domestic disturbance.  Doc. 19-1 at 1 (Kreifels Aff.).  According to dispatch, a caller had reported that her son, plaintiff Christian Washington, had shown up at her parents' house, violating a no-contact order between plaintiff and his grandfather.  *Id.* (Kreifels Aff.).  The caller also reported that plaintiff had jumped into a lake.  *Id.* (Kreifels Aff.).  Around 8:22 p.m., dispatch reported that the caller had called again, this time to report that plaintiff had left the house and was walking eastbound on Keywest Street.  *Id.* at 2 (Kreifels Aff.)

Around 8:26 p.m., Wichita Police Officers Mark Oliverson and Glen Whitsby found plaintiff walking alongside a road next to a field.  *Id.* at 2 (Kreifels Aff.); Oliverson AXON Video at 00:20–00:30.  Officer Oliverson got out of his patrol car and said, "Come over here, man," but plaintiff continued walking into the field.  *Id.* at 00:30–00:40.  Following behind plaintiff with Officer Whitsby, Officer Oliverson again said "Stop.  It's the police department. Come over here and talk to me."  *Id.* at 00:40–00:51.  Officer Oliverson reported on his radio that plaintiff had refused to stop and was heading north through the field.  *Id.* at 00:51–00:58. When Officer Oliverson again called after plaintiff, plaintiff started running.  *Id.* at 00:58–01:03. Officer Oliverson radioed that plaintiff was "running northbound" and began to run after him.

---

[2]     The court notes that Officer Kreifels didn't sign his Affidavit.  Nevertheless, the court will consider his Affidavit as part of the summary judgment record for two reasons.  *First*, plaintiff doesn't contest the validity of Officer Kreifels's Affidavit.  *Second*, while it's long settled and uniform practice "that an affiant should sign the affidavit[,]" a signature isn't required if "the affiant is sufficiently identified in the body of the affidavit[.]"  2A C.J.S. *Affidavits* § 22 (2022) ("[A] plaintiff's statement was an affidavit, despite the lack of the plaintiff's signature, where the plaintiff's name appeared as the person who took the oath.").  Here, the Affidavit identifies Officer Kreifels as the Affiant.  The court thus considers his Affidavit as part of the summary judgment record.

*Id.* at 01:03–01:15.  The video is hard to follow as Officer Oliverson and Officer Whitsby ran after plaintiff.  But, Officer Oliverson reported through his radio that plaintiff was wearing black shorts, a red shirt, and a tan hat.  *Id.* at 01:15–01:21.  And, he reported, plaintiff was reaching into his waistband as he ran.  *Id.* at 01:40–01:44.

About 15 seconds later, Officer Oliverson told plaintiff to get his hands out of his pockets.  *Id.* at 2:00–2:06.  While the video isn't the clearest—Officer Oliverson was still several yards away from plaintiff—at this point, it appears that plaintiff turned towards Officer Oliverson and shouted "fuck you."  *Id.*  As plaintiff shouted something indecipherable, Officer Oliverson told Officer Whitsby to "stay back just a bit."  *Id.* at 2:06–2:12.  For about 15 seconds, Officers Oliverson and Whitsby walked behind plaintiff from a distance, as plaintiff occasionally shouted indecipherably.  *Id.* at 2:12–2:27.  Officer Oliverson shouted at plaintiff "Show me your hands, man."  *Id.* at 2:27–2:30.  Officer Oliverson then continued to walk behind plaintiff at a distance.  *Id.* at 2:30–2:50.  He reported that plaintiff still had his hands at his waistband.  *Id.* at 2:45–2:50.  For about a minute, Officer Oliverson continued to walk behind plaintiff, who was so far ahead of him that he doesn't appear clearly on the video (the shadows cast by the setting sun obscure the view).  *Id.* at 2:50–3:50.  In the distance, the video shows a police patrol car, with its lights and sirens activated, drive into the field.  *Id.* at 3:30–3:50.  Driving this patrol car was defendant Officer Drake Kreifels.

Officer Kreifels had served in the Wichita Police Department for about a year at this point, since August 2018.  Doc. 19-1 at 1 (Kreifels Aff.).  But he'd graduated from the police academy about seven months before the events that led to this case.  Kreifels Interview 5:50–6:05.  When dispatch first reported the domestic disturbance involving plaintiff, Officer Kreifels was finishing a traffic stop.  Doc. 19-1 at 2 (Kreifels Aff.).  When he finished, he reviewed the

details of the call on his Mobile Computer Terminal (MCT), which provided four pieces of information:  (1) plaintiff reportedly had violated a no-contact order between him and a family member; (2) plaintiff had tried to jump into a lake; (3) plaintiff's physical description; and (4) plaintiff's location as he left the house.  Doc. 19-1 at 2 (Kreifels Aff.) (testifying that Kreifels "reviewed the details of the call on [his] MCT"); Kreifels Interview at 12:25–13:42 (Kreifels reporting that he didn't hear the initial 911 dispatch but saw just a few details on his MCT).[3] According to Officer Kreifels just a few hours after the shooting, this was all he knew at the time.  Kreifels Interview at 13:37–13:42.

Officer Kreifels drove to plaintiff's location, as reported by dispatch and Officer Oliverson.  Officer Kreifels's AXON bodycam video begins as he drove down the road alongside the field where Officers Oliverson and Whitsby were following plaintiff.  Kreifels AXON Video at 00:00–00:13.  The video shows that Officer Kreifels turned off the road and drove into the field towards plaintiff, who was running in the distance.  *Id.* at 00:13–00:27.  Before the car stopped, Officer Kreifels opened the door.  *Id.* at 00:22–00:27.  He then got out of the car and drew his gun immediately.  *Id.* at 00:27–00:32.  At this point, the bodycam audio begins.  Running after plaintiff, Officer Kreifels yelled "get your hands up" at least twice in a row.  *Id.* at 00:30–00:33.  He shouted this command two more times.  *Id.* at 00:33–00:40.  He then yelled at plaintiff to "stop running" and to "get your hands up" three more times.  *Id.* at

---

[3]     According to Officer Kreifels's Affidavit, the 911 dispatcher also reported that plaintiff "had gotten out of jail three days earlier for violating a PFA (a protection from abuse order)," and "had previously become violent and had been tased by the police."  Doc. 19-1 at 1–2.  Plaintiff disputes that Officer Kreifels knew this information when he responded to the call.  In Officer Kreifels's interview just hours after the shooting, he reported that he didn't hear the 911 dispatch.  Instead, he reported knowing only (1) that the caller had reported that plaintiff had violated a no-contact order between him and a family member; (2) that plaintiff had tried to jump into a lake; (3) plaintiff's physical description; and (4) plaintiff's location as he left the house.  Kreifels Interview at 12:25–13:42.  Given this factual dissonance, the court must accept plaintiff's version of events at this stage, *i.e.*, that Officer Kreifels didn't know anything about plaintiff's history with law enforcement.

00:40–00:49.  During this time, plaintiff had stopped running and faced Officer Kreifels while walking backwards.  *Id.*  He had his hands either at his side, or in front of him.  *Id.*  He then shouted, "fuck you" and immediately extended both arms out to his sides at shoulder height.  *Id.* at 00:50–00:51.  As he raised his hands, Officer Kreifels told plaintiff to "get [his] hands up."  *Id.* at 00:51.  Then, just as Officer Kreifels told plaintiff to get his hands up again, plaintiff began to move his arms in front of him.  Officer Kreifels fired his gun three times.  *Id.* at 00:51–00:52; *see also* Doc. 19-2 at 1–17 (still frames of this exact moment).  Plaintiff's movements and Officer Kreifels's shots occurred almost simultaneously within the span of just one second.  After Officer Kreifels shot him, plaintiff fell to the ground on his back.  *Id.* at 00:52–00:54.

With his gun still drawn, Officer Kreifels approached plaintiff.  *Id.* at 00:54–1:08.  He then shouted at plaintiff, for the first time, to "let go of whatever is in your right hand."  *Id.* at 1:08–1:11.  He again told plaintiff to "let go" and to put his hands on his head.  *Id.* at 1:11–1:16. By this time, Officer Oliverson and other officers had caught up with plaintiff.[4]  They arrested and searched him.  Oliverson AXON Video at 5:00–5:35.  Plaintiff was shot in the lower right abdomen.  *See id.* at 5:25–5:35.  He had a small black canvas bag with him.  The bag contained a compass.  Doc. 19-1 at 6 (Kreifels Aff.); *see also* Oliverson AXON Video at 4:56–5:00 (showing the bag on plaintiff's stomach), 5:17–5:20 (showing Officer Oliverson moving the bag).

A few hours later, a Wichita Police Department detective and KBI Investigator interviewed Officer Kreifels about the shooting.  Most relevant, Officer Kreifels told the investigators that he drove his patrol car onto the field in a "collision course" with plaintiff. Kreifels Interview 21:23–21:50.  Officer Kreifels then got out of his car and chased after plaintiff, still on a "collision course" with him.  *Id.* at 49:50–50:05.  Then, as Officer Kreifels

---

[4]     Officer Oliverson's bodycam captured the shooting event from afar, but it doesn't produce a clear picture of any material aspect of it.  Oliverson AXON Video at 4:00–4:15.

remembered it, plaintiff stopped jogging, turned to face him, and assumed a "shooter's stance." *Id.* at 23:10–23:40.  Officer Kreifels estimated that plaintiff was about 30 yards away from him. *Id.* at 23:35–23:40; *see also id.* at 46:05–46:20.  Officer Kreifels then said that plaintiff had shouted something like, "I want to die" or "I don't want to live."  *Id.* at 23:40–24:10.  Officer Kreifels said plaintiff had his right hand at his waistband at that moment.  *Id.* at 24:10–24:25. Then, as Officer Kreifels remembered it, plaintiff quickly drew his right hand out of his waistband with a black object in his hand, and then punched his right arm out in front of him.  *Id.* at 24:30–25:00.  And that's when Officer Kreifels fired his gun three times.  *Id.* at 25:00. Responding to questions near the end of the interview, Officer Kreifels repeated this same narrative again.  *See id.* at 45:00–45:40.

Officer Kreifels's Affidavit narrated the still frames of his bodycam video, and this narrative tells a bit of a different story.  Moving frame by frame through the video's key moments, Officer Kreifels testified that plaintiff had "stopped running and turned to his left facing [him] with his feet shoulder width apart and his right hand at his waistband."  Doc. 19-1 at 3 (Kreifels Aff.).  In Officer Kreifels's view, plaintiff appeared to assume a "shooter's stance." *Id.*  Then, plaintiff "raised his arms to his sides to approximately shoulder height."  *Id.* at 4. Officer Kreifels testified that he "could see a dark object in [plaintiff's] right hand."  Then, plaintiff "suddenly punched out with his right hand with the dark object directly at [Officer Kreifels]."  *Id.* at 5.  Officer Kreifels testified that he "believed the dark object in [plaintiff's] hand was a gun" and he feared plaintiff "was about to shoot" him.  *Id.* at 6.

The entire incident—from the moment Officer Kreifels left his patrol car to the moment he shot plaintiff—occurred in 26 seconds.  *See* Kreifels AXON Video at 00:27–00:53.  Plaintiff has recovered from his injuries.  He now brings this lawsuit.

## II.   Legal Standard

Summary judgment is appropriate when the moving party demonstrates "no genuine dispute" about "any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it can "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex Corp.*, 477 U.S. at 323. A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation cleaned up). To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotation cleaned up). When deciding whether the parties have shouldered their summary judgment burdens, the court's "function is not . . . to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III.   Analysis

Plaintiff asserts five claims against defendants:  (1) state law negligence against both defendants (Count I); (2) § 1983 excessive use of force against Officer Kreifels (Count II); (3) § 1983 failure to train against the City of Wichita (Count III); (4) § 1983 failure to supervise against the City of Wichita (Count IV); and (5) state law battery against both defendants (Count V).  Doc. 1-1 at 6–10.  Defendants move for summary judgment against all five claims.  Their motion centers on the same principal argument—that Officer Kreifels's use of deadly force was reasonable.  It thus follows, defendants contend, that all of plaintiff's claims fail.  Defendants argue that, if Officer Kreifels reasonably used deadly force, then (1) plaintiff fails to show a constitutional violation (dooming all his § 1983 claims), and (2) Officer Kreifels's use of force was privileged under state law (dooming plaintiff's state tort claims).  Alternatively, defendants argue, Officer Kreifels didn't violate clearly established law, and so he's entitled to qualified immunity against the excessive force claim.

The court disagrees with defendants' arguments.  On the current summary judgment record, the court can't conclude—as a matter of law—that Officer Kreifels's use of deadly force was reasonable.  When construing the evidence and drawing all inferences in the light most favorable to plaintiff, a reasonable jury could find that a reasonable officer in Kreifels's position would see that plaintiff was unarmed and beginning to comply with Officer Kreifels's commands when the officer shot him.  Accepting that version of events—as the court must at this stage—a reasonable jury thus could conclude that Officer Kreifels unreasonably used deadly force.  In other words, there's evidence in the summary judgment record to support a reasonable jury's

finding that Officer Kreifels violated plaintiff's constitutional rights.  And that right is clearly

established.  Tenth Circuit case law existing on July 14, 2019—the day of the shooting—clearly

established that officers can't use deadly force where "a reasonable officer would have known [a

suspect] was unarmed and posed no threat."  *Finch v. Rapp*, 38 F.4th 1234, 1238, 1243–44 (10th

Cir. 2022) (finding this clearly established law existed on December 28, 2017, and so, when

viewing all facts in plaintiff's favor, officer wasn't entitled to qualified immunity where he shot

an unarmed suspect from 40 yards away after the suspect had raised his hands and had lowered

them, because even though officer thought he saw a gun in suspect's hand, other witnesses had

testified suspect wasn't threatening).[5]  Officer Kreifels thus isn't entitled to qualified immunity.

And there's a triable issue whether he reasonably used deadly force.  So, summary judgment is

inappropriate on most of plaintiff's claims.

There's just one caveat.  Defendants also argue that, as a matter of law, plaintiff can't

bring a distinct negligence claim separate from his battery claim under this case's facts.  The

court agrees with this narrow argument.  So, it grants summary judgment against plaintiff's

negligence claim—but only against that claim.  The court explains these conclusions in more

detail, below.  It begins with this case's central claim, the excessive force claim against Officer

Kreifels.  The analysis concludes with the rest of plaintiff's claims.

## A.     § 1983 Excessive Use of Force

Officer Kreifels asserts qualified immunity against plaintiff's § 1983 excessive force

claim.  "The doctrine of qualified immunity protects government officials 'from liability for civil

---

[5]      As discussed more below, *Finch* was decided after this case's events.  Nonetheless, it's
instructive in determining the state of clearly established law on July 14, 2019.  And it's instructive to the
analysis of how to apply that clearly established law to this case's similar facts.  *See Finch*, 38 F.4th at
1243 (doing the same thing with "the most factually similar Tenth Circuit case" even though it "was
decided after the events in this case occurred" because it was "instructive" for "the analysis of whether
[officer's] conduct violated a clearly established right based on [Tenth Circuit] caselaw").

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation cleaned up).

To establish a § 1983 claim against an individual defendant who asserts qualified immunity, plaintiff must (1) come forward with facts that "make out a violation of a constitutional right," and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A right is clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts found the law to be as the plaintiff maintains." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quotation cleaned up). But "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (quotation cleaned up). Instead, the court must determine "'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

But, to overcome qualified immunity, it's not necessary that "'the very action in question has previously been held unlawful.'" *Id.* at 1866–67 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, the Supreme Court doesn't require a "reported case directly on point."

*Id.* at 1867 (quotation cleaned up).  Instead, the Court's case law requires district courts to evaluate whether "the unlawfulness of the officer's conduct [is] apparent" in "light of pre-existing law[.]" *Id.* (quotation cleaned up).  This standard "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  In short, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Ziglar*, 137 S. Ct. at 1867 (quotation cleaned up).

### 1. The Undisputed Facts Present a Genuine Issue Whether Officer Kreifels Violated Plaintiff's Fourth Amendment Rights

Officer Kreifels argues that qualified immunity protects him here because, in his view, the undisputed summary judgment facts present no triable issue whether he used excessive force that violated plaintiff's Fourth Amendment rights.  A claim that a law enforcement officer has used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.  *Cnty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017); *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (further citation and internal quotations omitted)).  When performing this analysis, the court must pay "careful attention to the facts and circumstances of each particular case, including the [(1)] severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The Supreme Court instructs other federal courts to judge the "'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* This approach to the reasonableness inquiry "must always account 'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). That an officer made a mistake about the need for force doesn't decide the question conclusively; rather, the court must analyze the situation as a reasonable officer would have analyzed it in the heat of the moment. *Graham*, 490 U.S. at 396–97.

Specifically, in cases involving deadly force, an officer's use of deadly force "is justified under the Fourth Amendment if a reasonable officer in [the defendant officer's] position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Est. of Larsen*, 511 F.3d at 1260 (quotation cleaned up). An officer's reasonable, but mistaken, belief that a suspect was likely to use force against the officer renders the use of force objectively reasonable because, as our Circuit has explained, a "reasonable officer need not await the glint of steel before taking self-protective action; by then, it is often too late to take safety precautions." *Id.* (quotation cleaned up). But, the "reasonableness of an officer's use of force depends also on whether the officer's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 771 (10th Cir. 2021) (quotation cleaned up); *accord Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1067 (10th Cir. 2020); *Pauly*, 874 F.3d at 1219–20; *see also Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 789–90 (10th Cir. 2022) ("It is worth noting that the Supreme Court

has not yet adopted the principle that reasonableness requires considering whether an officer recklessly created the need to use force. . . . But binding Tenth Circuit precedent requires [courts] to consider whether the officers' alleged reckless conduct created the need to use deadly force." (citations omitted)).  Ultimately, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."  *Est. of Larsen*, 511 F.3d at 1260.

Officer Kreifels argues that he deserves qualified immunity because, in his view, the undisputed facts show that using deadly force against plaintiff was objectively reasonable.  The court disagrees.  The three *Graham* factors—(1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight—present a genuine issue whether Officer Kreifels reasonably used deadly force.  The court begins by analyzing the first and third factors because, here, they're relatively straightforward to apply.  Then, the court addresses the hotly contested second factor—immediate threat to safety.

### a.  First *Graham* Factor:  Severity of the Crime

The first *Graham* factor inquires about the "severity of the crime at issue[.]"  *Graham*, 490 U.S. at 396.  It's undisputed that 911 dispatch had reported that plaintiff allegedly violated a protection from abuse order by visiting his grandfather's house.  But there's no indication from the 911 dispatch that plaintiff had acted violently,[6] or even that he possessed a weapon.  In Kansas, violating a protection from abuse order is a Class A misdemeanor.  Kan. Stat. Ann. §§

---

[6]      Given the factual disputes whether Officer Kreifels knew about plaintiff's prior encounters with law enforcement, the court accepts plaintiff's version of events—that Officer Kreifels did *not* know anything about that history when he responded to the 911 call.  *See supra* n.3.

21-5924(a)(1), (b)(1).[7]  Officer Kreifels also knew from Officer Oliverson's radio reports that plaintiff was running from Officers Oliverson and Whitsby.  Fleeing from law enforcement is a class A misdemeanor, when the offense predicating flight is a misdemeanor.  Kan. Stat. Ann. §§ 21-5904(a)(3), (b)(5)(b).  Thus, when Officer Kreifels arrived on scene and began chasing plaintiff, he had probable cause to believe that plaintiff had committed, at most, two non-violent misdemeanors.  In our Circuit, the first *Graham* factor weighs against an officer's use of force when the crime committed "is only a misdemeanor[.]"  *Koch v. City of Del City*, 660 F.3d 1228, 1246–47 (10th Cir. 2011); *see also Est. of Taylor*, 16 F.4th at 764 (collecting cases establishing that "where the offense is a misdemeanor, the first *Graham* factor ordinarily . . . weigh[s] against the use of significant force"); *Donahue v. Wihongi*, 948 F.3d 1177, 1196–97 (10th Cir. 2020) (explaining that a "misdemeanor committed in a particularly harmless manner reduces the level of force reasonable for the officer to use" and finding that the first *Graham* factor favored plaintiff when the crimes at issue were misdemeanors (quotation cleaned up)).

Seeking to support a different outcome, Officer Kreifels argues he also had probable cause to believe that plaintiff was about to commit aggravated assault on a law enforcement officer when, in his view, plaintiff drew a black object from his waistband and pointed it at him.  Aggravated assault on a law enforcement officer is a felony under Kansas law.  Kan. Stat. Ann. § 21-5412(e)(4).  But this offense isn't the relevant offense when the court evaluates the first *Graham* factor.  In some of the most recent decisions applying the *Graham* factors to uses of deadly force, our Circuit has focused on the reported offenses that officers were responding to when they arrived on the scene.  *See, e.g.*, *Est. of Taylor*, 16 F.4th at 763 (analyzing first *Graham* factor by observing that officer "was responding to a report that an unidentified male 'flashed' a

---

[7]      A Class A misdemeanor is the most serious of the three classes of misdemeanors recognized by Kansas law.  Kan. Stat. Ann. § 21-6602(a).

gun" which "could have been a misdemeanor or a felony" or " no crime at all" and not discussing at all the officer's belief, seconds later, that the suspect was drawing a gun to shoot him); *Arnold*, 35 F.4th at 792 (focusing the first *Graham* factor on officer's reasons for encountering suspect in the first place—her arrest "warrants for felony supervision violations and aggravated escape from custody"); *see also Est. of Valverde*, 967 F.3d at 1061 (explaining that an officer responding to a minor crime is "relevant to whether the officer was reasonable in evaluating ambiguous conduct to assess the threat"). And in any event, as discussed more below, a reasonable jury could disagree with Officer Kreifels's assessment that plaintiff held a black object in his hand. Thus, given that Officer Kreifels was responding to reported non-violent misdemeanors when he used deadly force, the first *Graham* factor weighs in plaintiff's favor.

### b. Third *Graham* Factor: Whether Plaintiff Evaded Arrest By Flight

The third *Graham* factor considers whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. It's undisputed that plaintiff fled from Officers Oliverson and Witsby on foot for several minutes. But, there's no sign the officers intended to arrest plaintiff when they first encountered him. Indeed, in the video, it appears Officer Oliverson just wanted to speak with plaintiff—or at least a reasonable jury could so conclude. When Officer Oliverson first encountered plaintiff, he asked him to "come over here, man." Oliverson AXON Video at 00:30–00:40. Then, when plaintiff began to jog away, Officer Oliverson told him to "come over here and talk to me." *Id.* at 00:40–00:51.

Nevertheless, even viewing the evidence and drawing all inferences in plaintiff's favor, plaintiff fled Officers Oliverson and Witsby for several minutes. And, when Officer Kreifels arrived, plaintiff continued to run. Given these competing circumstances—where plaintiff

wasn't fleeing *arrest*, but nevertheless was fleeing law enforcement—the third *Graham* factor weighs in Officer Kreifels's favor, but only slightly.

> ### c. Second *Graham* Factor:  Whether Plaintiff Posed An Immediate Threat to the Safety of Officers or Others

The court now turns to the second—and most intensely disputed—*Graham* factor.  It asks "whether the suspect pose[d] an immediate threat to the safety of the officers or others[.]" *Graham*, 490 U.S. at 396.  This second factor "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly*, 874 F.3d at 1216 (quotation cleaned up).

Deadly force "is only justified if the officer had 'probable cause to believe that there was a threat of serious physical harm to [himself] or others[.]'" *Id.* (quoting *Est. of Larsen*, 511 F.3d at 1260) (emphasis omitted).  To evaluate "the degree of threat facing an officer," the Tenth Circuit examines the "four component test first highlighted in *Estate of Larsen*." *Id.*  Those four "non-exclusive factors" are: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Est. of Larsen*, 511 F.3d at 1260.  While these four factors "are quite significant[,]" they are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'" *Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) (quoting *Est. of Larsen*, 511 F.3d at 1260).

When evaluating these factors and the totality of the circumstances, the court is especially mindful of two things.  *First*, it's undisputed that plaintiff was, in fact, unarmed when Officer Kreifels shot him.  But, the "salient question" is whether Officer Kreifels's "mistaken

perception[ ]" nonetheless was reasonable. *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020). *Second*, when answering that question, however, the court must view all conflicts in the light most favorable to plaintiff. Essentially, the court must accept plaintiff's version of the evidence as long as the summary judgment record supports it. *Est. of Taylor*, 16 F.4th at 756 ("[W]here the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts, all disputed facts must be resolved in favor of the party resisting summary judgment." (quotation cleaned up)). With those principles in mind, the court applies the *Estate of Larsen* factors to this case's facts.

*First*, the video shows, while plaintiff didn't comply with several of Officer Kreifels's commands, a reasonable jury could conclude that he was beginning to comply with them when Officer Kreifels shot him. When Officer Kreifels stepped out of his patrol car, he immediately shouted at plaintiff several times—ordering him to get his hands up and stop running. Kreifels AXON Video at 00:30–00:49. *Id.* Eventually, plaintiff stopped and turned towards Officer Kreifels. *Id.* at 00:42. He took a few steps backwards as Officer Kreifels directed him to get his hands up three more times. *Id.* at 00:42–00:49. Then, plaintiff shouted, "fuck you," and extended his arms to his side at shoulder height. *Id.* at 00:50–00:51. Plaintiff then moved his arms in front of him. *Id.* at 00:51–00:52; *see also* Doc. 19-2 at 1–17 (still frames of this moment). And that's when Officer Kreifels shot him. Kreifels AXON Video at 00:51–00:52. Viewing the video and drawing all inferences in the light most favorable to plaintiff, a reasonable juror could find that plaintiff was beginning to comply with Officer Kreifels's commands when he extended his arms to his side. At the same time, it's undisputed that, before that moment, plaintiff ran from Officer Kreifels, refused his commands, and shouted a profanity at him. So, while the first *Estate of Larsen* component favors plaintiff, it just barely does so.

*Second*, the video doesn't show clearly whether plaintiff made any hostile motions with a weapon—or anything at all—towards Officer Kreifels.  Breaking the video down frame by frame in his Affidavit, Officer Kreifels testified that he observed a "dark object in [plaintiff's] right hand."  Doc. 19-1 at 4 (Kreifels Aff.).  He testified that a zoomed-in pixelated video frame showing plaintiff with his arms raised at his sides shows that the "dark object can be seen in [plaintiff's] right hand."  *Id.*  But, after reviewing this pixelated still frame and evaluating it in the light most favorable to plaintiff, the court concludes that a reasonable jury could find that plaintiff wasn't holding anything in his hand.  And so, the court concludes, a reasonable jury could find that a reasonable officer in Kreifels's position would've recognized that fact.

In addition to the video and the still-frame—which a reasonable juror could view different ways—plaintiff has submitted evidence creating a genuine dispute about Officer Kreifels's credibility.  In Officer Kreifels's interview just hours after the shooting, he reported that:  (1) he observed plaintiff running with his right hand at his waistband; (2) plaintiff stopped to face him and assumed a "shooter's stance" with his right hand at his waistband; (3) said something like "I want to die" or "I don't want to live;" and (4) quickly drew his hand from his waistband and pointed a black object directly at Officer Kreifels.  Kreifels Interview 23:10–25:00; *see also id.* at 45:00–45:40 (repeating this same narrative).  But, as already described, the video tells a different story.  The video shows that plaintiff, after turning and facing Officer Kreifels, walked backwards, moved his hands from his waistband, extended his arms to his sides at shoulder height, and then moved his arms in front of him.  Kreifels AXON Video at 00:40–00:52.  The video doesn't show plaintiff quickly drawing something from his waistband and then pointing that object directly at Officer Kreifels.  Nor does it capture plaintiff saying anything like "I want to die" or "I don't want to live."  Indeed, breaking down the video's key frames, Officer

Kreifels's Affidavit never testifies that plaintiff quickly drew the dark object from his waistband and immediately pointed it directly at him.  Nor did he testify that plaintiff ever said something like "I want to die" or "I don't want to live."

Thus, Officer Kreifels's Affidavit—narrating his view of the video—shifts gears from the story he told in his interview, just hours after the shooting.  Given that no one besides Officer Kreifels witnessed the shooting at a close enough range, Officer Kreifels's credibility likely is a key issue in this case.  And the summary judgment record contains material inconsistencies in his account of the shooting.  As our Circuit has emphasized, district courts can't make "'credibility determinations'" about an officer's testimony "'on summary judgment.'"  *See Est. of Smart*, 951 F.3d at 1170 (10th Cir. 2020) (quoting *Pauly*, 874 F.3d at 1217).  Indeed, where there are "'inconsistencies in the officer['s] testimony, a jury will have to make credibility judgments[.]'" *Id.* (quoting *Pauly*, 874 F.3d at 1217); *see also id.* (concluding that testimony from other eyewitnesses "all tend[ed] to discredit the police officers' story" that the victim had a gun (quotation cleaned up)).  Given these inconsistencies, a reasonable jury could reject Officer Kreifels's testimony and find, based on the video evidence, that plaintiff didn't have anything in his right hand.  Accepting this version of events, a reasonable jury could also conclude that a reasonable officer in Kreifels's position would recognize that plaintiff's hands were empty and that his movements, therefore, weren't hostile or threatening.

To be sure, a reasonable jury could also accredit Officer Kreifels's depiction of the video, *i.e.*, that plaintiff had a dark object in his hand and pointed that object at Officer Kreifels. But the court can't conclude, as a matter of law, that the video conclusively establishes that this depiction is the only reasonable view of the evidence.  And "where the record does not unequivocally point in one direction and allows for a genuine dispute concerning the facts, all

disputed facts must be resolved in favor of the party resisting summary judgment." *Est. of Taylor*, 16 F.4th at 756 (quotation cleaned up). Also, because Officer Kreifels's story has evolved over time, adopting his version of the facts at this stage both would (1) draw inferences in his favor, and (2) resolve a material factual issue at the summary judgment stage. The court can do neither. *See id.* at 756–57. In short, triable issues remain whether it was reasonable for Officer Kreifels to believe plaintiff had made hostile motions with a weapon in his direction. The second *Estate of Larsen* factor thus weighs in plaintiff's favor.

*Third*, Officer Kreifels estimated that he was about 30 yards away from plaintiff when he shot him. While the video doesn't confirm the exact distance separating the two men, it at least shows a considerable distance separated plaintiff and Officer Kreifels. The court thus considers the 30-yard distance as an undisputed material fact. Construing that fact and drawing all inferences in plaintiff's favor, a reasonable juror could find at least two things: (1) that it was difficult for Officer Kreifels to discern whether plaintiff had anything in his hand, and (2) as a result, a reasonable officer in Kreifels's position wouldn't use deadly force in such ambiguous circumstances—especially when that officer was responding to reported non-violent misdemeanors. *See Est. of Valverde*, 967 F.3d at 1061 (explaining that an officer responding to a minor crime is "relevant to whether the officer was reasonable in evaluating ambiguous conduct to assess the threat"); *cf. id.* ("Drawing [a] gun to fire at an officer is a hostile motion with hostile intent and presents a lethal threat *when the officer is close by*"—in that case, "only a few feet away" (emphasis added)). Thus, the third *Estate of Larsen* factor weighs in plaintiff's favor.

*Fourth*, the video undisputedly shows that plaintiff manifested at least some negative intentions towards Officer Kreifels. Plaintiff ran from Officer Kreifels, and, when he turned to face him, shouted "fuck you." Shouting a profanity at a police officer isn't likely to justify use

of deadly force—especially where the surrounding circumstances, when viewed in the light most favorable to plaintiff, favor plaintiff.  But, even viewing this moment in the light most favorable to plaintiff, a reasonable jury couldn't escape the conclusion that plaintiff manifested at least some negative intentions towards Officer Kreifels.  So, the fourth *Estate of Larsen* factor weighs in Officer Kreifels's favor—but only slightly.

In sum, the first, second, and third *Estate of Larsen* factors weigh in plaintiff's favor (though the first one does so only slightly).  The fourth factor weighs slightly in Officer Kreifels's favor.  But as our Circuit has explained, the *Estate of Larsen* factors are "only aids in making the ultimate determination, which is 'whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force.'"  *Tenorio*, 802 F.3d at 1164 (quoting *Est. of Larsen*, 511 F.3d at 1260).  And plaintiff raises one other consideration that the court finds significant:  how Officers Oliverson and Whitsby responded to similar circumstances that Officer Kreifels faced.

In plaintiff's view, a reasonable jury could find, based on how Officers Oliverson and Whitsby responded to plaintiff, that Officer Kreifels acted unreasonably in using deadly force.  The court agrees.  On the video, Officers Oliverson and Whitsby don't appear to have drawn their guns as they pursued plaintiff—not as he ran away from them for several minutes, not as he reached to his waistband, and not even when he turned to them and shouted, "fuck you" from a distance.  *See* Oliverson AXON Video at 00:40–3:50.  Indeed, right after Officer Oliverson ordered plaintiff to get his hands out of his pockets, and after plaintiff shouted "fuck you" and other indecipherable things in response, Officer Oliverson instructed Officer Whitsby to "stay back just a bit" to maintain distance from plaintiff.  *Id.* at 2:00–2:12.  Contrast that reaction with Officer Kreifels—who (1) drove into the field and chased plaintiff on what he called a "collision

22

course" with him, (2) exited his vehicle with his gun immediately drawn, and (3) charged towards plaintiff screaming at him, before using deadly force within seconds.  The court recognizes that Officers Oliverson and Whitsby didn't face the exact situation that Officer Kreifels faced.  But they faced almost identical circumstances to Officer Kreifels's situation—and responded quite differently.  That they didn't use deadly force after plaintiff grabbed at his waistband and turned and shouted "fuck you" at them from a distance—the same circumstance that led Officer Kreifels to use deadly force—is a relevant comparison for a jury to weigh.  A reasonable jury could compare how other officers evaluated an almost identical situation and find that Officer Kreifels unreasonably used deadly force.

This same comparison also bears "'on whether [Officer Kreifels's] own reckless or deliberate conduct during the seizure unreasonably created the need to use [deadly] force.'"  *Est. of Taylor*, 16 F.4th at 771 (quoting *Est. of Valverde*, 967 F.3d at 1067).  Our Circuit repeatedly has emphasized that "the Fourth Amendment excessive-force inquiry is not limited to" the "precise moment that lethal force was used."  *Id.*; *see also Est. of Valverde*, 967 F.3d at 1067 ("'Our precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" (quoting *Pauly*, 874 F.3d at 1219)).  Viewing the evidence in the light most favorable to plaintiff, a reasonable jury could find that, unlike the other officers, Officer Kreifels recklessly escalated a non-lethal situation to a lethal one.  Officer Kreifels knew merely that plaintiff reportedly had violated a no-contact order and was running from officers in an empty field.  He nevertheless drove onto the field on a "collision course" with plaintiff, immediately drew his gun, and ran after him.  Then, after plaintiff stopped running, turned

towards Officer Kreifels, extended his arms to his side (beginning to comply with commands), and moved his arms in front of him, Officer Kreifels shot him—all in 26 seconds.

The court understands that Officer Kreifels testified that he observed plaintiff grabbing at his waistband multiple times.  But a reasonable jury could conclude that if Officer Kreifels thought plaintiff was carrying a firearm at his waistband as he ran away, a reasonable officer in his position—responding only to non-violent misdemeanors—wouldn't charge towards plaintiff with his gun drawn.  Also, a reasonable jury could find this view of the evidence appealing where, as here, plaintiff was in an empty field and the nearest officers were several yards away. *Cf. Est. of Valverde*, 967 F.3d at 1062 (holding that use of deadly force was reasonable as a matter of law where officers were executing a reverse-buy-bust-operation, defendant officer knew that victim "was involved in high-violence criminal enterprises—dealing guns and large quantities of drugs[,]" officer "saw" from a few feet away "the barrel of a gun as [the victim] pulled it from his waistband or pocket[,]" and it was undisputed that victim indeed had a gun). Thus, Officer Kreifels's choices about how to respond to this situation bear on the answer to the question whether his eventual use of deadly force 26 seconds later was reasonable.[8]

---

[8]    The court is mindful that the "seminal cases in this area, where the officers' conduct was deemed reckless," involved situations where the summary judgment record supported a finding that a reasonable officer "would have had reason to believe" that the victim "was impaired in [some] way by emotional or psychological problems" or "was impaired through ingestion of alcohol or other intoxicants."  *Est. of Taylor*, 16 F.4th at 772 (collecting cases).  There's no evidence in the summary judgment record to support a finding that plaintiff was so impaired, or that Officer Kreifels had reason to believe he was. Thus, the court expresses no opinion whether Officer Kreifels's actions immediately preceding the shooting could establish—on their own—a Fourth Amendment violation.  But his actions leading to the shooting still are relevant to the question whether he reasonably assessed the situation and reasonably used deadly force under the circumstances.  *Est. of Valverde*, 967 F.3d at 1067 (explaining how Circuit "'precedent recognizes that the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force'" (quoting *Pauly*, 874 F.3d at 1219)).

In the end, the second *Graham* factor is riddled with difficult fact issues.  The summary judgment standard requires the court to view the facts in plaintiff's favor.  And, applying that standard, the court finds that a reasonable jury could conclude that a reasonable officer in Kreifels's position would have perceived plaintiff was unarmed and didn't endanger the lives of officers or others nearby.  The court apprehends that these movements occurred under circumstances that were "tense, uncertain, and rapidly evolving[,]" which required Officer Kreifels to make a "split-second judgment[ ]" about the need for deadly force.  *Pauly*, 874 F.3d at 1215.  And, in the moment, Officer Kreifels didn't have the benefit of reviewing still frames of events that transpired in just seconds.  The court recognizes that it can't view these facts "with 20/20 vision of hindsight" but instead must consider them "from the perspective of a reasonable officer on the scene[.]"  *Id.* (quotation cleaned up).  Nevertheless, viewing the facts and drawing rational inferences in plaintiff's favor, there's a triable issue whether Officer Kreifels reasonably perceived plaintiff pointing a deadly weapon at him—particularly where the video is inconclusive, and the gloss Officer Krieffels imposed on it now differs from the story he recited just hours after the shooting.  From these facts, the court can't conclude—as a matter of law— that it was reasonable for Officer Kreifels to perceive plaintiff pointing a gun at him, thus justifying the use of deadly force.

### d.  Conclusion

After considering all three *Graham* factors, the court finds that the first and second factors favor plaintiff, and the third factor favors Officer Kreifels.  These factors and the totality of the circumstances preclude the court from finding on summary judgment—as a matter of law—that Officer Kreifels's use of deadly force was reasonable under the summary judgment facts here, and thus didn't violate plaintiff's Fourth Amendment rights.  *See, e.g.*, *Reavis ex rel. Est. of Coale v. Frost*, 967 F.3d 978, 986–87, 990–92 (10th Cir. 2020) (affirming denial of

qualified immunity where the first and third *Graham* factors favored the officer but the second *Graham* factor favored plaintiffs because "a reasonable jury could find that [the officer's] use of deadly force was objectively unreasonable under the totality of the circumstances"). More specifically, construing the evidence in the light most favorable to plaintiff, a reasonable jury could find from the perspective of a reasonable officer on the scene, that the totality of the circumstances didn't support probable cause to believe that plaintiff had committed severe crimes or that he posed a threat of serious physical harm to Officer Kreifels or others. So, the court can't conclude—as a matter of law—that Officer Kreifels was justified in his use of force. The court thus finds Officer Kreifels isn't entitled to summary judgment in his favor on his qualified immunity defense under the first prong of the analysis, *i.e.*, that no constitutional violation occurred.

### 2.  Plaintiff's Constitutional Right Was Clearly Established

Officer Kreifels alternatively argues that, even if the summary judgment facts present a triable issue whether he violated plaintiff's constitutional right against excessive force, he's entitled to summary judgment for an independent reason. He argues that the asserted constitutional right was not clearly established when he shot plaintiff on July 14, 2019. Thus, he contends, the second prong of the qualified immunity analysis bars plaintiff's § 1983 claim against him. The court disagrees.

As explained above, a "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11 (quotation cleaned up). The Supreme Court has instructed courts "not to define clearly established law at too high a level of generality." *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021). Instead, "the clearly established law must be 'particularized' to the facts of

the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  But this standard doesn't "'require a case directly on point' for a right to be clearly established[.]"  *Id.* at 551 (quoting *Mullenix*, 577 U.S. at 12).  The court's "analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law."  *Reavis*, 967 F.3d at 992 (quotation cleaned up).  Nevertheless, to find that a statutory or constitutional right is clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White*, 137 S. Ct. at 551 (quoting *Mullenix*, 577 U.S. at 12).  Specifically, the precedent clearly establishing a constitutional right must come from "a Supreme Court or Tenth Circuit decision on point," or from "the clearly established weight of authority from other courts[.]"  *Reavis*, 967 F.3d at 992 (quotation cleaned up).

Having found a triable issue whether it was reasonable for Officer Kreifels to conclude that plaintiff was armed and threatening, the court must define the clearly established right using the summary judgment facts viewed in the light most favorable to plaintiff.  That is, the court must determine whether it was clearly established that an officer cannot use deadly force on a suspect who:  is located in an open, unconfined area; reportedly had committed only non-violent misdemeanors; had turned to face an officer and extended his arms to his side and then in front of him as the officer commanded him to get his hands up.[9]  The court concludes that Tenth

---

[9]     The court rejects Officer Kreifels's framing of the clearly established right.  He contends that plaintiff must produce a case where an officer "violated the Fourth Amendment rights of a suspect whom officers had probable cause to believe had a weapon, had ignored police orders, ran from the officers, and moved in a manner that reasonably appeared to place the officer in imminent danger of death or great bodily harm."  Doc. 19 at 24.  This framing of the clearly established right impermissibly views the facts in the light most favorable to Officer Kreifels.  And the court can't use this approach on summary judgment.  *See Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003) (rejecting officers' framing that "the use of deadly force against an individual who is running at an officer armed with a piece of concrete is not unconstitutional and certainly was not prohibited by clearly existing law" because it "[did] violence" to well-established summary judgment principles and "credit[ed] the Officers' version of events rather

Circuit case law on July 14, 2019 clearly established this principle.  Plaintiff cites many cases to carry his burden of showing that Officer Kreifels violated clearly established law.  Some of these are inapposite, but three directly apply.  The court discusses each one, in turn, below.

The *first* applicable case is *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003).  There, officers responded to a reported assault at an apartment building.  *Id.* at 1224.  When officers located the suspect in his apartment, he "was acting very excited and aggressive."  *Id.* at 1224– 25.  Then, when officers attempted to handcuff him, the suspect struck one officer in the head and kicked another in the groin.  *Id.* at 1225.  The suspect then ran from the apartment, with the officers in pursuit.  *Id.*  At one point, the suspect emerged from a hiding place and struck one of the chasing officers again.  *Id.*  He then picked up "a four-inch piece of concrete" and, after unsuccessfully trying to climb a fence, ran toward an officer while raising his arm to throw the concrete.  *Id.*  Officers fired their guns in response, killing the suspect.  *Id.*  The Circuit denied qualified immunity to the officers because, among other things, there was a factual dispute whether officers fired while the suspect held the concrete in his hand.  *Id.* at 1227.  Assuming plaintiff's version of events was true—meaning that eyewitnesses had reported he "was no longer holding the concrete at the time the shots were fired"—the Circuit held that officers violated clearly established law by using deadly force against an unarmed suspect.  *Id.* at 1227– 28.

The officers in *Carr* arguably had more reason to fear for their safety than Officer Kreifels did here.  The *Carr* suspect not only had escaped arrest but had assaulted the officers several times as he fled.  And, at some point, he had picked up a piece of concrete to throw at them from a close distance.  But, because there was a factual dispute whether he had dropped the

---

than—as is proper—the factual matrix most favorable to [plaintiff]" which meant accepting his version of the facts that he "was no longer holding the concrete at the time the shots were fired").

concrete before officers shot him, the Circuit denied qualified immunity.  Thus, *Carr* clearly

established that—even when a suspect had escaped arrest, fled from officers, assaulted them

multiple times, and picked up a piece of concrete to throw at them—officers can't use deadly

force if a reasonable officer in their positions would've perceived that the suspect was unarmed

at the moment they used deadly force.  Applying *Carr* and viewing the evidence and drawing all

inferences in plaintiff's favor, Officer Kreifels violated clearly established law by using deadly

force against an individual who was running away and was unarmed when he turned to face

Officer Kreifels, extended his arms to his side, and moved them in front of him.

The *second* applicable case is *Finch v. Rapp*, 38 F.4th 1234 (10th Cir. 2022), decided by

the Circuit just recently.  Because it was decided this year—2022—*Finch* itself can't clearly

establish that Officer Kreifels's conduct was unconstitutional on July 14, 2019.  But, the cases

*Finch* relied on to conclude that the officer there had violated clearly established law all pre-

dated the date of this case's shooting—July 14, 2019.  *See id.* at 1242–43.  And, significantly, the

events in *Finch* took place in December 2017.  *Id.* at 1238.  So, if Tenth Circuit precedent clearly

had established a point of law by December 2017, that same precedent clearly established the

same point of law on July 14, 2019.  *Finch* is thus instructive.  *See id.* at 1243 (relying on a

"factually similar Tenth Circuit case" that "was decided after the events in this case occurred"

because it was "instructive" for "the analysis of whether [officer's] conduct violated a clearly

established right based on [Tenth Circuit] caselaw" pre-dating the facts at issue).

In *Finch*, officers were responding to "a hoax emergency call" from "a deranged man

who had just killed his father and was holding the rest of his family hostage at gunpoint."  *Id.* at

1237.  Officers rushed to Finch's house "where the caller claimed to have committed the

crimes."  *Id.*  Turns out, "Finch had not committed any crime and had no way of knowing why

police were surrounding his home." *Id.* As he walked out his front door, "multiple officers yelled different commands." *Id.* Standing on the front porch of his home, Finch "initially appeared to comply with officer commands, raising his hands up to about ear level." *Id.* at 1239. At that point, officers "could see Finch was not holding anything in his hands." *Id.* "Finch then began to lower his hands[,]" and there was conflicting testimony about what he did next. *Id.* One officer said Finch did nothing threatening, another said Finch reached towards his back, and a third said he was reaching for a weapon. *Id.* The officer who was the defendant testified that—from 40 yards away—he "saw Finch grab the right side of his hoodie and lift it up, making a motion that appeared as if he was drawing a firearm." *Id.* That officer "thought Finch was not complying with commands and possibly was armed[,]" and "testified he thought he saw a gun in Finch's hand." *Id.* So, the officer shot Finch, killing him. *Id.*

Our Circuit affirmed the district court's decision denying qualified immunity to the officer. The Circuit concluded it was bound by the district court's factual determination that "a reasonable jury could find that (1) [the officer] fired a shot when he could see Finch's hands were empty, (2) [the officer's] assertion that Finch made a threatening motion was false, and (3) [the officer] could not see Finch's movements clearly due to darkness and distance[.]" *Id.* at 1241. Thus, a reasonable jury could conclude that the officer "did not reasonably believe Finch posed a threat." *Id.* Accepting that version of events as true, the Tenth Circuit agreed with the district court that Tenth Circuit case law, as of December 2017, clearly established that "even when responding to a dangerous reported situation," an officer "may not shoot an unarmed and unthreatening suspect." *Id.* at 1243. The Circuit succinctly described its own cases clearly establishing this proposition, so those descriptions deserve attention in this case:

> First, in *Zuchel v. Spinharney*, [890 F.2d 273 (10th Cir. 1989),] police approached a man having a confrontation with a group of teenagers. One of the teenagers yelled

that the man had a knife as the man turned around and approached the officers. An officer shot the man four times. The man had only been holding a pair of fingernail clippers. The court denied qualified immunity.

In *Zia Trust Co. ex rel. Causey v. Montoya*, [597 F.3d 1150 (10th Cir. 2010),] police responded to a report of a dispute between a caller and his adult son, who had mental health issues. The dispatcher reported that there were firearms at the residence. The officer arrived at the residence and saw the suspect sitting in a van. The man allegedly pointed the wheels of the van at the officer. The officer fired a single shot into the van and killed the suspect. The court affirmed the denial of qualified immunity.

In *Walker v. City of Orem*, [451 F.3d 1139, 1157 (10th Cir. 2006),] police officers reported to the residence of an individual who they had been told was suicidal and "en route to cause harm to his family." It was reported that the suspect was unarmed. When the police arrived, the suspect held a box cutter to his wrist. An officer shot the suspect and a second officer shot two more rounds. The district court denied qualified immunity, finding that the suspect did not pose a threat and was not moving toward anyone.

Finally, in *King v. Hill*, [615 F. App'x 470 (10th Cir. 2015),] a nonprecedential case, officers received a report about a mentally ill man making threats against his spouse. Despite testimony that the man did not have anything in his hands, an officer shot him with a rifle after the man yelled at the officers to get off his property and threatened them. The court relied on *Tennessee v. Garner*[, 471 U.S. 1, 11 (1985)] for the established principle that an "officer may not seize an unarmed, nondangerous suspect by shooting him dead."

*Finch*, 38 F.4th at 1242–43 (further citations omitted). The Circuit recognized that these cases didn't present "identical facts" to *Finch*'s facts. *Id.* at 1243. And yet, the Circuit concluded, it did "'not think that it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself.'" *Id.* (quoting *Zia Tr. Co.*, 597 F.3d at 1155). Thus, "[t]aken together," these four described cases clearly established—as of December 2017— "that an officer, even when responding to a dangerous reported situation, may not shoot an unarmed and unthreatening suspect." *Id.* Because a "jury could find [the officer] shot Finch even when a reasonable officer would have known Finch was unarmed and posed no threat[,]"

the officer "violated clearly established law" when viewing the facts in the light most favorable to Finch  *Id.* at 1243–44.

So too here.  The court already has decided (as explained above) that a reasonable jury could find (1) that Officer Kreifels shot plaintiff when his hands were empty, (2) that Officer Kreifels's assertion that plaintiff was carrying a gun isn't worthy of belief, and (3) that Officer Kreifels couldn't see plaintiff's movements clearly given that he was 30 yards away.  *See supra* pp. 18–22.  A reasonable jury thus could conclude that Officer Kreifels shot plaintiff "even when a reasonable officer would have known [plaintiff] was unarmed and posed no threat."  *Id.* at 1243–44.  So, viewing the evidence and drawing all inferences in plaintiff's favor, Officer Kreifels violated the pre-July 14, 2019, clearly established law discussed in *Finch*.  *See id.* at 1242–43; *see also Huff v. Reeves*, 996 F.3d 1082, 1090 (10th Cir. 2021) (collecting cases illustrating how the Circuit has "clearly established" through "repeated application in [its] case law" over the years that "officers are prohibited from using deadly force against a person when it is apparent that the person poses no physical threat to the officers or others").

*Last*, plaintiff relies on *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997)—a frequently discussed decision in deadly force cases.  This district court in *Allen* denied summary judgment to officers who used deadly force because a reasonable jury could conclude, based on differing accounts of the officers' actions, that the officers "were reckless and precipitated the need to use deadly force."  *Id.* at 841.  As the Circuit recently summarized, the "officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands."  *Arnold*, 35 F.4th at 794 (citing *Allen*, 119 F.3d at 841).

Before the court applies *Allen* to this case, however, it must address an important argument raised by Officer Kreifels.  The Supreme Court recently reversed a decision by our Circuit holding that *Allen* clearly established that deadly force was unreasonable in that case's circumstances.  *See City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9 (2021) (per curiam).  There, officers responded to a call from a woman who had reported that her ex-husband was intoxicated and wouldn't leave her home.  *Id.* at 10.  The officers "engaged in a conversation" with the man outside his ex-wife's garage, then "followed him into [the] garage at a distance of 6 to 10 feet, and did not yell until he picked up a hammer" and raised it above his head in a threatening manner.  *Id.* at 12.  Only then, after the man ignored several commands to drop the hammer, did officers draw their guns and fire, killing the man.  *Id.* at 10–11.  The Supreme Court held that those facts were "dramatically different" from *Allen*'s facts.  *Id.* at 12.  And so, *Allen* could not "come[ ] close to establishing that the officers' conduct [in *Bond*] was unlawful."  *Id.*

Since the Supreme Court's decision in *Bond*, our Circuit has held that any "reliance on *Allen* to determine whether the officers' conduct 'was reckless or that their ultimate use of force was unlawful' requires sufficient factual symmetry."  *Arnold*, 35 F.4th at 794 (quoting *Bond*, 142 S. Ct. at 12; then citing *Lennen v. City of Casper*, No. 21-8040, 2022 WL 612799, at *9 (10th Cir. Mar. 2, 2022)).  Fully mindful of this admonition, the court concludes that this case—though not identical to *Allen*—has sufficient factual symmetry with the facts in *Allen*.  Recall *Allen*'s key circumstances:  officers "responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands."  *Id.* (discussing *Allen*, 119 F.3d at 841).  Now, line those circumstances alongside this case's facts. Officer Kreifels responded to an individual who reportedly had committed a non-violent misdemeanor, was running through an empty field, and wasn't threatening anyone.  This

33

circumstance mirrors the *Allen* officers responding to an individual sitting in a parked car who, at that time, reportedly was a danger only to himself.  Consider next that Officer Kreifels drove his patrol car into the empty field on a "collision course" with plaintiff, left his car with his gun drawn, and immediately ran towards plaintiff while shouting commands at him.  Those actions mirror the actions of *Allen*'s officers, who "sprint[ed] towards a parked car, screaming at the suspect[.]"  *Id.*  While Officer Kreifels didn't physically wrest a gun from plaintiff—plaintiff notably was unarmed—the court nevertheless is convinced that the remaining mirroring circumstances in this case provide sufficient factual symmetry with *Allen*.

As support for this conclusion, compare this case's facts to two recent Circuit decisions which lacked the requisite factual symmetry with *Allen*.  *Cf. Arnold*, 35 F.4th at 794 (finding "insufficient factual symmetry between the facts in *Allen* and the present case" because, unlike in *Allen*, officers "conversed with [the suspect] for many hours, engaged her from within the house at a safe distance, and did not yell until she threatened them with a gun"); *Lennen*, 2022 WL 612799, at *9 (finding "no factual symmetry between *Allen* and the present case" where officer "attempt[ed] to engage [armed suspect] in conversation, retreat[ed] once [the suspect] rapidly and aggressively advanced toward him while armed [with a sword], and discharg[ed] his weapon only after he issued multiple warnings for [suspect] to drop his sword").  This case is much closer to *Allen* than these recent Circuit decisions declining to apply *Allen*.  And, this case's facts are closer to *Allen*'s than the facts in *Bond*, which the Supreme Court determined didn't "come[ ] close" to *Allen*.  *Bond*, 142 S. Ct. at 12.  Unlike the officers in *Bond*, Officer Kreifels didn't engage plaintiff in conversation, nor calmly follow him, nor keep his gun holstered until he perceived a deadly threat.  Instead, under plaintiff's view of the facts, he did the opposite.  He drove into an empty field on a "collision course" with plaintiff, drew his gun immediately, ran

after him, and fired within seconds of plaintiff turning around, extending his arms to his side, and moving them in front of him.

The court is mindful that the Supreme Court and the Tenth Circuit have admonished district courts to discern factual symmetry. But, again, the court is convinced that *Allen* applies with sufficient factual symmetry here—especially because *Castle v. Carr*, and the clearly established case law discussed in *Finch v. Rapp*, combine with *Allen* to show that Officer Kreifels's actions, when viewed in the light most favorable to plaintiff, violated clearly established law. Thus, Officer Kreifels isn't entitled to qualified immunity.

### B.     Plaintiff's Other Claims

Aside from the § 1983 excessive force claim against Officer Kreifels—this case's central claim—plaintiff brings other claims against both Officer Kreifels and the City of Wichita. He brings state law negligence and battery claims against both defendants. And he brings § 1983 failure to train and failure to supervise claims against the City of Wichita. Defendants move for summary judgment against all those claims, arguing that Officer Kreifels's use of deadly force was reasonable as a matter of law. Thus, defendants contend, Officer Kreifels's actions were privileged under state law. And, they argue, absent a constitutional violation by Officer Kreifels, there's no basis for plaintiff's § 1983 claims against the City of Wichita. But, the court already has determined that a reasonable jury could find that Officer Kreifels violated plaintiff's Fourth Amendment rights. So, these arguments can't support summary judgment. Nevertheless, defendants succeed on one argument aimed at plaintiff's negligence claim that doesn't presuppose whether Officer Kreifels's use of force was reasonable. The court addresses all these arguments, below.

*First*, the court denies summary judgment against plaintiff's § 1983 failure to train and failure to supervise claims. The City of Wichita's sole argument against these claims is that plaintiff can't hold it liable "if the [City's] officer in fact inflicted no constitutional harm." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). But the court already has determined that a reasonable jury could find that Officer Kreifels violated plaintiff's constitutional rights. The City of Wichita asserts no other arguments for summary judgment against these claims. So, the court denies summary judgment against the § 1983 claims plaintiff asserts against the City of Wichita.

*Second*, defendants' asserted state privileges don't apply against plaintiff's state law claims. "In Kansas, whether an officer is liable for intentional use of force—known formally as assault and battery—turns on whether the use of force was privileged." *Arnold*, 35 F.4th at 796 (citing *Est. of Randolph v. City of Wichita*, 459 P.3d 802, 817 (Kan. Ct. App. 2020)). And, under "Kansas law, officers justifiably use deadly force when they 'reasonably believe [ ] that such force is necessary to prevent death or great bodily harm to such officer or another person.'" *Id.* (quoting Kan. Stat. Ann. § 21-5227(a)). Again, the court already has concluded that a reasonable jury could believe Officer Kreifels unreasonably used deadly force against plaintiff. So, the privilege created by Kan. Stat. Ann. § 21-5227(a) doesn't apply to Officer Kreifels as a matter of law. Nor can Officer Kreifels seek refuge in Kansas's statutory self-defense provision, Kan. Stat. Ann. § 21-5231, for the same reason. *See Est. of Randolph*, 459 P.3d at 818 (determining that officer couldn't "rely on self-defense to warrant summary judgment" against battery claim because "the summary judgment record include[d] factual disputes" whether officer reasonably used deadly force). Also, defendants' laundry list of other asserted immunities under the Kansas Tort Claims Act—for discretionary functions, failure to provide police protection, failure to

adopt or enforce certain policies, and adoptive immunity, Kan. Stat. Ann. §§ 75-6104 (c)–(e), (i), (n)—don't apply either.  The Kansas Court of Appeals recently rejected all these immunities at the summary judgment stage where there was a factual issue disputing whether an officer's use of force was reasonable.  *Est. of Randolph*, 459 P.3d at 819–822.  The court applies that same holding to the state law claims at issue here.

*Last*, and on a different note, the court agrees with defendants that, as a matter of law, this case's facts can't support a negligence claim.  The parties devote several pages in their briefs to whether plaintiff can maintain a distinct negligence claim separate from his battery claim under Kansas law.  But, as the court understands it, the Kansas Court of Appeals squarely has addressed this issue.  In *Estate of Randolph v. City of Wichita*, the Kansas Court of Appeals recognized that a claim for "negligent use of force"—though a "strange tort"—"likely exists under Kansas law[.]"  *Id.* at 822.  But, such a claim can't exist on facts where an officer shot a civilian.  *Id.*  The Kansas Court of Appeals elaborated:  "in *some* circumstances a person might be able to bring a negligence claim under Kansas law arising out of an incident involving a law enforcement officer's physical contact with that person, resulting in an injury."  *Id.* at 823; *see also id.* at 822 (listing examples (1) where officer used a "jujitsu throw" to arrest a resisting suspect and left the suspect "with permanent physical injuries not normally associated with the martial arts maneuver" and (2) where officer pursued fleeing suspected felon down a street in his patrol car and unintentionally struck and injured the suspect (citations omitted)).  But an officer's use of force in a "fatal shooting . . . virtually defines a civil battery if not otherwise privileged."  *Id.* at 823.  As in *Estate of Randolph*, here, Officer Kreifels "deliberately fired [three] shots at [plaintiff's] torso—an intentional application of deadly force."  *Id.*  Negligence didn't cause the officer's weapon to fire.  It was the product of a deliberate act.  In the words of the Kansas court,

the "shooting was not the product of negligence or carelessness," and so, it's either "a privileged use of force or . . . an actionable battery." *Id.* The court thus agrees with defendants that, as a matter of law, the summary judgment facts here can't support a negligence claim. The court thus grants summary judgment against Count I's negligence claim—but only that claim. As in *Estate of Randolph*, plaintiff here has asserted an actionable battery claim, given the factual dispute whether Officer Kreifels reasonably used deadly force.

## IV.   Conclusion

The court concludes that a reasonable jury could find that Officer Kreifels unreasonably used deadly force against plaintiff, thus violating his Fourth Amendment rights. Because those rights were clearly established at the time Officer Kreifels shot plaintiff, Officer Kreifels isn't entitled to qualified immunity. Given that conclusion—and the triable issues in this case—the court denies summary judgment against plaintiff's § 1983 claims (Counts II, III, IV) and state law battery claim (Count V). But, because this case's facts can't support a negligence claim as a matter of law, the court grants summary judgment against plaintiff's negligence claim (Count I).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Summary Judgment (Doc. 19) is granted in part and denied in part, as specified in this Order.

**IT IS SO ORDERED.**

**Dated this 23rd day of August, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
